## Thomas Nokes lessee of William Morris, *against* John Smith.

Lands aliened *bona fide* by the heirs, are subject to the debts of the ancestor. The old mode in Pennsylvania of docking intails, was by selling the lands for the debts of the testator.

THIS cause came on to trial on the 31st March 1792, when a verdict was taken for the plaintiff, subject to the opinion of the court on the following case.

John Hunt died seized of the lands in question, but not having taken the oath or affirmation of allegiance, was disabled from making a will, by the act "for the further security "of the government," passed April 1st, 1778. He left issue, one son and two daughters; and appointed Rachael Hunt and Henry Hale Graham, his executors. His son, some years after his death, sold the premises, for a valuable consideration, to William M'Cullough, whose executor leased the same to defendant. Thomas Corbin afterwards obtained judgment against Hunt's executors for a *bona fide* debt due to him from Hunt, and the premises were duly sold and conveyed, by the sheriff, to the lessor of the plaintiff.

The point reserved for the opinion of the court, was, whether lands aliened *bona fide* by the heir, were subject to the debts of the ancestor?

It was admitted that the plaintiff must necessarily recover one moiety of the premises, the daughters not having joined in the conveyance; but, if the deed of the son prevailed, then judgment, as to the other moiety, must be given for the defendant.

The court desired the counsel for the defendant to begin:

Whereupon it was contended by them, that the doctrine insisted on for the plaintiff, was pregnant with all the dangerous consequences of secret uses. 2 Bl. Com. 331. No one could make a purchase of lands with any degree of safety. How many multiplied liens must be immediately created upon the successive deaths of several ancestors and heirs?

It was laid down as a rule, that wherever liens are introduced *by statute, means are always provided to furnish the purchaser *with information, as matter of record, or [*239 some act of public notoriety.

A purchaser for a valuable consideration without notice, shall hold the land discharged of any trust or confidence. 2 Bl. Com. 329. So if tenant in tail becomes indebted to the

1 YEATES—15

[Morris, Lessee *v.* Smith.]

king, by judgment, recognizance, obligation, or other spe-
cialty, and dies, and before any process or extent, the issue in
tail *bona fide* aliens the land in tail, the land shall not be ex-
tended by force of the act of 33 Hen. 8, because the purchaser
is a stranger to the debts of tenant in tail.   7 Co. 21. b.   By
stat. 27 Hen. 8, c. 16, bargains and sales shall not enure to
pass a freehold, unless the same be made by indenture, and
enrolled within six months in one of the courts of Westmin-
ster Hall, or with the *custos rotulorum* of the county; though
it is otherwise as to chattel interests.   2 Bl. Com. 338.

Formerly, when the universal method of conveyance was
by livery of seisin, no gage or pledge of lands was good, unless
possession was also delivered to the creditor; and the reason
was, to prevent subsequent and fraudulent pledges of the same
land.   Ib. 159, 160.

The statutes of fraud cannot receive too liberal a construc-
tion, or be too much extended in suppression of fraud.   But
notwithstanding the general words of the stat. 13 Eliz. cap.
5, such a construction is not to be made in support of creditors,
as will make third persons sufferers.   Therefore the statute
does not militate against any transaction *bona fide*, and where
there is no imagination of fraud.   And so in the common
law; per Lord Mansfield.   Cowp. 434.

By the common law, if the heir before an action brought
against him, had aliened the assets, the obligee was without
any remedy.   3 Bac. Abr. 26.   So if the heir aliened the
lands before the writ, and took them back again, the lands
shall not be charged, because he is in of other estate.   7 Vin.
147. pl. 3, in margin.   And the stat. 3 and 4 Will. and Mar.
c. 14, which was made to prevent this injury to creditors,
contains this express provision, that the lands *bona fide*
aliened by the heir at law before the action brought, shall not
be liable to execution.   And it has been determined by Lord
Macclesfield, that the person of the heir is the debtor, and
not the lands; and, consequently, the lands in the hands of an
alienee can be charged with nothing but what is an immediate
lien thereon, which a bond is not.   Prec. Cha. 512.

It was further urged, that the acts of assembly respecting
intestates' estates, as to this point, must be construed strictly.
A purchaser of lands from an heir, without notice, and the
creditor *of the ancestor, are in equal equity.   The
act of assembly of 12 Will. 3, pa. 7, directs, that "all
"lands within this government shall be liable to sale upon
"judgment and execution obtained against the defendant, the
"owner, his heirs, executors, or administrators, where no
"sufficient personal estate is to be found."   These words do
not create any lien on the land, until judgment.   The lien, in
equity, takes place from the judgment.   3 Term Rep. 370.
All the words of the law may be satisfied by a reasonable con-
struction.   The owner of lands may sell them even after a

[Morris, Lessee v. Smith.]

suit brought, and immediately before judgment. So may the heir, and in both instances, they will pass unincumbered to the purchaser.

The act of 4 Ann. cap. 38, pa. 49, contains the same expressions in effect, and should receive the same construction.

The act of 4 Ann. c. 21, pa. 33, directs, that the Orphans' Court, in each county, shall distribute the surplusage of the estate of any person dying intestate, after all debts, funeral and just expences of every sort first allowed and deducted, in a particular manner.

But it is evident, that this surplus respects as well personal as real estate: and it will not be pretended, that if executors, or administrators, sold goods or mere chattel interests in the course of administration, that the creditors of the deceased could recur to the property in the hands of the vendees. Why should not lands receive the same construction? The 8th section of the act, (pa. 35,) lays no additional restraint in the case of real estates. It only determines the cases of children, or heirs at law, entitled to the lands. It does not respect the cases of purchasers. Suppose one by will appointed his executors, or trustees, to sell his whole estate; and, pursuing the language of this law, directed that, (after payment of his just debts, funeral and other just expences,) the surplusage should be distributed in a certain mode; and afterwards, the executors, or trustees, sold the same *bona fide*, but embezzled the money eventually in violation of their trust. Will it be said that the fair purchasers are to be affected thereby?

There are only two instances, that we know of, which can be put in England, analogous to the point before the court; 1st, When personal property is sold for payment of debts, 2d, Where lands are sold, charged with the payment of debts.

As to the first instance, it has been repeatedly determined, both in law and in equity, that no creditor can follow goods aliened by executors or administrators for a valuable consideration without fraud; because a purchaser has no power of knowing * the debts of the deceased, and if such pur- [*241] chases should be controlled, no one would venture to buy. 1 Atky. 463.

As to the second instance. One devises his real estate to trustees, to sell and pay his own and his father's debts and legacies, and the residue to his two sisters. No particular debts were specified in the will, but legacies to the residuary devisee and others to a considerable amount were given by both their wills. The trustees sell great part of the estates, and embezzle the money without discharging the debts and legacies: the rest of the estate was possessed by one of the residuary devisees. Decreed, that where there is a trust or devise for payment of debts generally, a purchaser is not obliged to see to the application of his money, as he is where there is a schedule, or particularizing of the debts. Ambl.

[Morris, Lessee *v.* Smith.]

188.    But where an estate by will is charged with payment of debts generally, if the devisee sell pending a suit by creditors for sale and payment of debts, such alienation is void; because the jurisdiction of the court being attached, it would be inconvenient to permit a sale but by the court.    Ib. 676. One devises all his real and personal estate to G, his heirs, executors, administrators and assigns, charged with the payment of his debts; the plaintiffs, who were bond creditors, never asked for their principal, but received their interest regularly for sixteen years of G, the executor, who, during this interval, made several sales of the testator's estate; held, that the purchasers should not be disturbed, after a quiet possession of sixteen years.    2 Atky. 41.

If lands are devised to be sold for payment of debts in a schedule, the purchaser is bound to see the purchase money applied to the payment of those debts; but if the trust be general to pay debts, though he has notice of them, yet the purchaser is not obliged to see the money applied.    1 Vern. 301.    2 Cha. Cas. 115.    1 Equ. Cas. Abr. 358, pl. 1, 2.

In the state of New Jersey, the intestate laws, as to the point in question, bear a strong similitude to those of this state.    (Vide New Jersey laws, passed December 1742, pa. 129.)    A remarkable case happened in that government.    One Thomas Leonard, of Princeton, died possessed of a considerable estate.    He devised his lands to his nephews, who afterwards sold them, and by their extravagance soon consumed the purchase monies.    A creditor of the testator obtained a judgment against his executors, and attempted to recover the same, by seizing in execution the lands sold by the devisees; but on full argument, he was prevented from doing it by the court.

The argument *ab inconvenienti*, holds equally strong in case of a *bonâ fide* purchaser of lands from the heir without notice, *as in the case of a creditor of the ancestor, who lays by, without taking the proper steps for the recovery of his debt.    There are already many liens on lands, created by the municipal laws of the government; they should not be increased by the introduction of constructive ones, for no human prudence can guard against them; and it is of the utmost consequence in an infant country, that the sales of real estates should not be fettered further than is absolutely necessary for the common welfare.

The counsel for the plaintiff insisted, that the point before the court had been fully settled by the decision in the Common Pleas of Philadelphia county, in the case of Graff *v* Smith's administrators.    Dallas 481.

They urged, that the policy of England differed materially from that of this state.    The system of the former went no further than to the aggrandizement of eldest sons.    The first institutions of our government wore a very different aspect.

[Morris, Lessee *v.* Smith.]

By the laws agreed on in England, between the governor and first adventurers in 1682, (Append. pa. 4, § 14,) it was declared, that all lands and goods shall be liable to pay debts, except where there is legal issue, and then, all the goods and one-third of the land only.    By the act of 1688, (Append. pa. 10, cap. 189,) lands were made liable to pay debts.    By the act of 1693, (Append. pa. 13,) all estates, real and personal, which any person had in this province and territories at the time of his decease, shall be liable to be seized and sold for the payment of the just debts of the deceased persons, so far as the same shall extend; and after all debts are paid, the surplusage of the real and personal estate to be distributed in a certain manner.

By the act of 1700, (Append. pa. 16,) all lands shall be liable to be seized and sold for the payment of decedents' just debts; and where the testator's or intestate's personal estates are sufficient to pay all debts and damages owing by them respectively at the time of their deaths, with all charges incident thereunto, then the real estates to be disposed of and distributed in a particular mode.

The act of 4 Annæ, § 8, pa. 35, directs that the surplusage or remaining part of intestate's lands not sold, or ordered to be sold, shall be divided between the intestate's widow and • children, &c.    The intention of the legislature is here manifest, that until the debts of the decedent are paid, the heir is entitled to the lands only *sub onere.*

The counsel for the plaintiff were stopped by the court.

M'Kean C. J.    The rules in England do not apply to the * case now before us.    Our own acts of assembly must [*243 determine the question.

On the first settlement of the province, it was established, that the lands of deceased persons should be liable to the payment of their debts.    This continued until the act of 4th Annæ, when a provision was made by the legislature as to the mode, by which the surplus of real estates was to be divided, after payment of debts and funeral expences.    In the infancy of the province, the bulk of the property consisted of lands; personal property bore but a small proportion thereto, and creditors necessarily must have relied on the real estates of deceased persons as their security.

The universal opinion has been, that the lands of decedents were chargeable with the payment of their debts.    Whatever my sentiments might be, if it were a recent case, I am concluded by the general opinion, the unsettling whereof would be attended with dangerous consequences.    The general idea of the bar has been as I have stated, and we have been furnished with a copy of the opinion of Mr. Chew on this point, on a case put by the creditors of John Jones, who died some years before the revolution.    He there says, "The constant "construction of the act of ·4th Annæ has been, that until

[Morris, Lessee v. Smith.]

"payment of the just debts of an intestate, no descent or dis-
"tribution can give the children an indefeasible right in the
"lands of the intestate; but they, and all purchasers under
"them, take the lands under the act, subject to the payment
"of the intestate's just debts, and the practice has gone ac-
"cordingly."

The personal estate should be first applied to the payment
of the debts of the deceased. When this fund is deficient the
lands are liable. The arguments from inconvenience hold
strongly on both sides of the question; but this is a matter of
mere legislative wisdom, and does not belong to us.

Shippen, J. Having heretofore delivered my sentiments
on this subject, when sitting as president of the Court of
Common Pleas, and those sentiments being in print, (Dallas
481,) it is the less necessary for me to be very particular in
delivering my present opinion, especially as I have seen no
reason to alter it.

Our ancestors in Pennsylvania seem very early to have en-
tered into the true spirit of commerce, by rejecting every
feudal principle that opposed the alienation or partibility of
lands. While, in almost every province around us, the men
of wealth or influence were possessing themselves of large
manors, and tracts of land, and procuring laws to transmit
them to their eldest sons, the people of Pennsylvania gave
their conduct and *laws a more republican cast, by
*244] dividing the lands, as well as personal estate, among
all the children of intestates, and by subjecting them, in the
fullest manner, to the payment of their debts. There was a
time, within my remembrance, when lawyers held that com-
mon recoveries for docking estates tail could not be legally
suffered in Pennsylvania; and the first that was suffered, will
be found among the records of the Common Pleas, in my
hand writing, when a young student. The practice, how-
ever, was not generally adopted till the passing of the act of
assembly in 1750, which expressly authorized it. As lands,
by means of intails, were before this time daily rendered un-
alienable, the only way of docking them was by the instru-
mentality of the very acts of assembly under our consideration;
and nothing was more common, and it was every day's prac-
tice, for lawyers to advise the instituting suits against the
executors of the testator, (perhaps many years after his death,)
for the sole purpose of taking the intailed lands in execution,
and barring the intail. Many lands are now held under these
titles. There was then but one opinion upon the subject.
The acts of assembly were taken in the utmost latitude, for
the purpose of making lands responsible to creditors; for
other purposes, they were suffered to retain the qualities of
real estate. They were bound from the time of the judg-
ment, not execution. They never went into the hands of

[Morris, Lessee v. Smith.]

executors, or administrators, as chattels; although, for the purpose of making them answerable to creditors, they were by a kind of fiction expressed in the executions to be in the hands of executors and administrators to be administered. They either went into the hands of the heirs by descent, or to devisees under the will of the testator; and then they waited the event of a settlement of the deceased's debts. No one ever imagined, that by a hasty sale the creditors could be stripped of their security in the land. This produced caution both in the heirs and the purchasers; and, when doubts occurred, an indemnity was expected, or what was more common, a sale by the sheriff took place. No mischiefs were formerly experienced from this construction of the law. It is said that lately, since our population has increased, and of course the transactions of family concerns become less notorious, some inconveniences have arisen to purchasers. This may shew the necessity of legislative interference, in order to limit the time of the lands remaining liable, but cannot be a reason for a court of justice to overturn a construction, which has prevailed for near a century past in Pennsylvania.

Yeates, J. I fully concur. It appears to me evident, that the *general opinion, from the first settlement of this [*245 government, has been, that the lands of an ancestor, though aliened *bona fide* by the heir, are still subject to the payment of his debts; and, at this day, it would be highly dangerous to impeach it. In the course of my practice I have known some cases of this kind, both before and since the revolution, acquiesced in, though attended with circumstances of apparently considerable hardship.

The opinion of this court in the case of Morris's executors *v.* M'Conaughy's executors, in September term last, was founded on the principle that lands, though devised, continued assets for the payment of the testator's debts, in case of a deficiency of personal property; and the purchaser of lands from a devisee, or heir, cannot, in my idea, be in a better situation than the vendors, under the general usage.

The idea of the liability of lands to pay the debts of deceased persons, has grown up with the laws since the charter of the late province; and if any inconveniences shall be experienced therefrom, it is competent to the legislature alone to remedy them.

Mr. Justice Bradford gave no opinion, having formerly been retained as counsel in the cause.

Judgment for the plaintiff.

Messrs. Wilcocks and Rawle, *pro quer.*

Messrs. Ingersoll and Sergeant, *pro def.*

Cited in 1 Y., 388; 3 S. & R., 455; 9 S. & R., 331; 11 S. & R., 431; 13 S. & R., 383; 5 Watts, 367; 15 Pa., 447; 77 Pa., 260.

[Morris, Lessee v. Smith.]

Prior to the Act of Feb. 24, 1834, debts of every kind were recoverable by action against the personal representatives, without notice to the heirs, and a sheriff's sale of the real estate of a decedent, on such a judgment, conclusively passed the title, even as against an alienee of the heir. Tryon v. Munson, 77 Pa., 260.