# Horner & Roberts *versus* Hasbrouck.

*Orphans' Court, Powers and Jurisdiction of, discussed.—Interest of Heir in Ancestor's Real Estate subject to Debts of Decedent.—Sheriff's Sale of Heir's Interest, passes only what remains after payment of Debts of Decedent.*

1. In Pennsylvania, the lands of a decedent, like his goods, are assets for payment of debts, and the right of succession has respect only to so much of the estate as remains after payment of debts.

2. Where the interest of an heir in his ancestor's real estate was sold on execution for his own debt, a subsequent sale of the whole property, made by order of the Orphans' Court for the payment of debts of the intestate, will divest the title of the purchaser of the interest of the heir at sheriff's sale.

3. W., owning real estate, died leaving eight sons, and the creditors of one of them levied on and sold his interest therein to A., who some time after sold to B.; the administrator of the decedent afterwards, by order of the Orphans' Court, sold all his real estate for payment of debts to H. & R., who took possession. In an ejectment brought against them by B., as vendee of the interest bought at sheriff's sale, it was *Held*,

That the sheriff's sale passed to the purchaser only the interest of the heir after the payment of debts, and that the sale of the real estate by the order of the Orphans' Court for the payment of debts, vested a valid title thereto in the purchasers.

4. Milliken *v.* Kendig, 2 Pa. Rep. 447, and Luce *v.* Snively, 4 Watts 396, overruled. Swaar's Appeal, 1 Barr 93, commented on and explained.

ERROR to the District Court of *Allegheny county*.

This was an action of ejectment, to November Term 1860, by

[Horner & Roberts *v.* Hasbrouck.]

Cicero Hasbrouck against Simpson Horner, Geo. W. Roberts, and Richard Easterbrook, for the undivided eighth part of lot No. 13, in the borough of Elizabeth, with the ferry rights and appurtenances thereto annexed, in which the following case was stated for the opinion of the court:—

On the 4th day of June 1856, John Walker, Sr., died intestate, seised in fee simple of (*inter alia*) the entirety of the land and premises described in the writ, leaving no widow,' but leaving eight children him surviving, of whom Samuel Walker was one.

On October 18th 1856, judgment was recovered in the District Court of Allegheny county, in No. 474, November Term 1856, against said Samuel Walker, in favour of James, Kent & Santee, for $776.89, and costs.

On the 10th day of April 1858, on the *præcipe* of Robert Arthurs, as attorney of said James, Kent & Santee, a *fieri facias* was issued thereon to No. 369, of April Term 1858, on which a levy was made on said Samuel Walker's interest in the real estate of intestate; inquisition and condemnation thereof was had; a *venditioni exponas* thereon issued to No. 274, July Term 1858, and the right, title, interest, and claim of Samuel Walker in the property in question, and in six other pieces or lots of said land, was sold by the sheriff to said Robert Arthurs for $67, on the 31st of July 1858, and a sheriff's deed therefor acknowledged in open court, August 28th 1858, and recorded. The money arising from said sale having been paid into court, an auditor was appointed on the 24th day of July 1860, to distribute the same, upon whose report, made September 2d 1860, the balance, after payment of costs, was appropriated to a judgment of David Spering & Co. *v.* John Walker, Sr., obtained against the defendant in his lifetime, and the first lien against him. There were also other judgments against intestate, which were liens upon his real estate at the time of his death.

On the 19th day of May 1860, said Robert Arthurs and wife, by deed of that date, recorded in the recorder's office of said county, on the 22d May 1860, conveyed the land and premises described in the writ (with the residue of the lands described in said sheriff's deed) to Cicero Hasbrouck, the plaintiff, for the sum of $200.

At the Orphans' Court sale, in No. 111, March Term 1860, hereinafter related, the following notice was read:—

"NOTICE TO BIDDERS.—All persons are hereby notified that I have purchased the one undivided eighth part of the real estate now offering for sale as the property of John Walker, Sr., deceased (except lot No. 69). That said one-eighth part was sold at sheriff's sale to Robert Arthurs, Esq., and conveyed by sheriff's deed to him, acknowledged August 28th 1858, and by him conveyed to me by deed. That said deeds are of record in this

[Horner & Roberts v. Hasbrouck.]

county, and that I claim said one-eighth part of the several lots now offered (except No. 69), and shall claim the same notwithstanding this sale.

" C. HASBROUCK.

" May 25th 1860."

From the time of the sheriff's sale to the date of the deed to C. Hasbrouck, Robert Arthurs, Esq., was in perception of the one-eighth of the rents of said real estate.

On 1st November 1856, at No. 70, October Term 1856, Robert C. Walker, administrator of John Walker, Sr., presented his petition to the Orphans' Court of said county, showing that the personal estate of his intestate was insufficient for the payment of his debts, and praying an order to make sale of his real estate for that purpose, and the court made such order, in pursuance whereof all said real estate was sold on 8th December 1856, which sale, on report thereof, made 17th January 1857, was confirmed *nisi*.    To this exceptions were filed, *inter alia*, by Robert Arthurs, as attorney for James, Kent & Santee, judgment-creditors of Samuel Walker, being the first liens on his interest in his father's estate, and on the 29th day of July 1857, the court made a decree sustaining the exceptions, and setting aside all the proceedings, at the cost of the administrator.    From this decree the administrator took an appeal to the Supreme Court, which was argued by *Hamilton* and *Morrison*, for appellants, and *Robert Arthurs*, for James, Kent & Santee, as appellees ; and the court affirmed the decree of the Orphans' Court, except as to costs : *Pro ut* Walker's Appeal, 1 Grant's Cases.

On 17th October 1857, Robert Arthurs, as attorney aforesaid, presented a petition to the Orphans' Court, reciting the proceedings in No. 70, October Term 1856, and praying citation to R. C. Walker, the administrator, returnable to 21st November 1857, to show cause why he should not be removed, and another administrator appointed in his stead.

On the 9th day of April 1858, the court made an order granting said prayer, removing said R. C. Walker, as administrator, and directing the register to appoint another ; but no other was appointed until after the acknowledgment of the sheriff's deed to Robert Arthurs, as aforesaid, nor until 22d November 1859 ; all the heirs having, in the mean time, successively and at considerable intervals, renounced their rights to administration.

On the 28th day of April 1860, the Orphans' Court made an order, authorizing John Patterson, who had been appointed administrator of said intestate, in room of R. C. Walker, removed as aforesaid, to sell all the real estate of intestate for the payment of his debts, in pursuance whereof the same was sold on the 25th day of May 1860, the entirety of the lot and premises

[Horner & Roberts *v*. Hasbrouck.]

in question to Horner & Roberts, for $3000, and the other property included in the deed of Arthurs for $2825. This sale was duly confirmed by the court on the 23d of June 1860, and a deed therefor executed and delivered by said administrator to Horner & Roberts, under which they (and the other defendant as their tenant) took possession of the land, and were in exclusive possession thereof at the time of the institution of this suit.

The whole net proceeds of this sale were distributed by order of the court to the judgment liens against John Walker, Sr., in the order of their precedence, leaving unsatisfied of them over $6000, and there was nothing left for his heirs.

If the court be of opinion that the plaintiff is entitled in law to recover, then judgment to be entered for the plaintiff for the premises described in the writ, with six cents damages and costs; but if not, then judgment to be entered for the defendants, with costs. Each of the parties reserving the right to sue out a writ of error therein.

The court below, on hearing the case, entered judgment for the plaintiff. The case was thereupon removed into this court by the defendants, where the entering of judgment for plaintiff, and the refusal of the court below to enter judgment for the defendants on the case stated, were assigned for error.

*Hamilton* and *Acheson*, for plaintiffs in error.—It was the manifest intention of the legislature, in the Acts of 29th March 1832, and 24th February 1834, and the supplements thereto, to invest the Orphans' Court with the exclusive administration of the estates, real and personal, of decedents: Kittera's Estate, 5 Harris 422; Whitesides *v*. Whitesides, 8 Id. 473; Black's Executors *v*. Black's Executors, 10 Casey 357; Ashford *v*. Ewing, 1 Id. 213.

As respects the conversion of the real estate of a decedent into money for the payment of his debts, the Acts of 1832 and 1834 devise a complete system—a system which excludes the interference of the common law tribunals, where the Orphans' Court has taken jurisdiction.

We submit that the doctrine contended for by the other side, and sanctioned by the court below, is subversive of the whole Orphans' Court system for the administration of the real assets of a decedent. In vain did the legislature enact the 35th section of the Act of 1834, if the decision of the court below be correct. There is no authority anywhere to stay an execution against the heir, and the sale and administration of the real estate of the decedent is thus taken out of the hands of the Orphans' Court.

Again: the administrator cannot be compelled to make distribution of the personal estate until one year after the granting of administration. But, according to the decision of the court

[Horner & Roberts v. Hasbrouck.]

below, upon an execution against the heir, the whole real estate of the intestate may be swept away within a month after his decease, and that, too, before letters of administration have issued.

Moreover, the heir oftentimes bears a different name from the ancestor, and the public advertisement of the sale of the estate of the former would afford no sufficient notice to the creditors of the deceased.

Again: All recognise the importance of selling land as an *entirety*. Thus sold, it always yields a better price than when disposed of in undivided shares. But the interests of both heirs and creditors are liable to be jeopardized if the decedent's real estate may be converted into money by piecemeal, upon as many different executions against undivided shares as there are heirs.

To defeat the title of the plaintiffs in error the defendant relies on the cases of Milliken *v.* Kendig, 2 Penna. R. 477, and Luce *v.* Snively, 4 Watts 396. These cases arose prior to the Acts of 1832 and 1834, at a time when our Orphans' Court system was yet in its infancy, and they do not rule a case arising since the passage of said acts. Besides, there is such a marked difference between the Intestate Act of 19th April 1794, under which Milliken *v.* Kendig and Luce *v.* Snively were decided, and the intestate Act of 8th April 1833, which governs this case, as to justify a different ruling.

Undoubtedly under the Intestate Act of 1833, upon the death of the ancestor intestate, his real estate descends to and vests in the heir. But the interest of the heir is not *absolute*, but *contingent*. He takes, in the language of the act, "*all that remains after payment of all just debts and legal charges.*" Lands being assets for payment of debts, the estate of the heir is liable to be divested. When a judgment-creditor of the heir levies upon and sells the right, title, interest, and claim of the heir, the purchaser acquires such *contingent interest*, and nothing more. He takes the same estate as he would upon purchase from the heir.

If it be said that "judicial sales divest all liens," we answer that this is by no means a universal rule. It has many exceptions: In re McKenzie's Appropriation, 3 Barr 156; Mix *v.* Ackla, 7 Watts 316; Swaar's Appeal, 1 Barr 92. The case of Parr *v.* Bouzer, 16 S. & R. 309, seems directly to rule the question under consideration in favour of plaintiffs in error.

We submit that by virtue of the proceedings at No. 70, October Term 1856, In re petition for the sale of the real estate of John Walker, Sr., deceased, commenced November 1st 1856, the Orphans' Court acquired *exclusive jurisdiction over the lands of decedent for purposes of conversion*. That jurisdiction was not ousted by the subsequent proceedings in the District Court against Samuel Walker, at the suit of James, Kent & Santee. It is true,

[Horner & Roberts *v.* Hasbrouck.]

the first Orphans' Court sale was set aside, and that order was affirmed by this court. But subsequently the Orphans' Court made an order directing John Patterson, the administrator *de bonis non* of John Walker, Sr., to sell said real estate for payment of debts, and this must be regarded as a continuation of the original proceedings. In this view the title of the plaintiffs in error dates back to November 1st 1856, and must prevail against that of defendant in error.

*Thomas Ewing*, for defendant in error.—The proceedings in the Orphans' Court *prior* to the sheriff's sale are wholly irrelevant. All the proceedings were set aside and formally decreed *to be null and void*, and that decree was affirmed by the Supreme Court: Walker's Appeal, 1 Grant's Cases 431.

The sole question is this: Does a regular sheriff's sale of the real estate of an heir, over two years after the death of the ancestor, divest the lien of the debts of the ancestor? or, in other words, does the purchaser at such sale take the land discharged of the lien of the debts of the ancestor?

The interest which Samuel Walker took in the real estate of his deceased father was an estate in fee simple, subject to the *lien* of the debts of his father.

The Act of June 16th 1836, § 66, Purd. Dig., p. 340, § 73, says that the purchaser at sheriff's sale, his heirs and assigns, shall quietly and peaceably hold the land sold, "as fully and amply, and for such *estate* and *estates*, and under the same *rents* and *services* as he or they for whose debt or duty the same shall be sold, could or ought to do at or before the taking thereof in execution."

Now, the Act of 1794 and the Act of 1834 both call the debts of the ancestor a *lien* on the estate of the heir, and no one will pretend that they are either "*rent*" or "*service*." Then, by a fair construction of the statute, when Robert Arthurs purchased the interest of Samuel Walker in the real estate in question, he took an estate in fee simple, discharged of all *liens*. Such was the construction of the Supreme Court on the statutes of 1700 and 1705. And the Act of 1836 is but a condensation of those acts: Pres. Corp. *v.* Wallace, 3 Rawle 109, 141.

The policy of the law in Pennsylvania has been, from the first, to make a judicial sale of land vest a complete title in the purchaser free from all encumbrances: Loomis's Appeal, 10 Harris 316; Barnet *v.* Washabaugh, 16 S. & R. 412; Commonwealth *v.* Alexander, 14 S. & R. 257; Milliken *v.* Kendig, 2 Penna. Rep. 477; Graff *v.* Smith, 1 Dallas 505; Luce *v.* Snively, 4 Watts 396.

The sheriff's sale to Robert Arthurs was fair, open, and regular in all the proceedings, and there is no room for pretence or

[Horner & Roberts *v.* Hasbrouck.]

allegation that there was any understanding or expectation that
he took subject to any liens, and had there been, it would not
affect Mr. Hasbrouck purchasing without notice.

The cases cited by the plaintiff in error are all cases in which
the lien was saved either by statutory provision or by some fixed
lien intervening. In Swaar's Appeal, 1 Barr 92, the case of Luce
*v.* Snively is expressly recognised by the court as the existing
law. Parr *v.* Bouzer, 16 S. & R. 309, shows that the land was
charged with an annuity for the life of the widow; and this,
being a permanent lien, not divested by a sheriff's sale against
the devisee, preserved all prior liens, thus proving the rule by
one of its established exceptions. And there the proceeds of
the sheriff's sale had been applied to the debts of the devisee.
There were also other circumstances in that case different from
the present.

The first section of the Act of April 8th 1833 is but a con-
densation of the third and part of the second sections of the
Act of 1794; and within a year of the passage of the Act of
1833, we have a legislative construction of the character of the
debts of the decedent, in regard to the real estate in the hands
of his heirs: "No debts of a decedent, except they be secured
by mortgage or judgment, shall *remain a lien* on the real estate
of such decedent, longer than five years, &c." In 1794–97 and
in 1834, they are alike but a lien. See Simpson *v.* Kelso, 8
Watts 252; McCoy *v.* Scott, 2 Rawle 222; Adams *v.* Adams, 4
Watts 163; Swartz's Estate, 2 Harris.

The heir takes an absolute, *not* a "contingent" estate, at the
instant of the ancestor's death, subject to the lien of the ances-
tor's debts. So, if A. purchase land from B., against whom
there is a judgment, A.'s estate is liable to be divested by a sale
for B.'s debt. The estate of the heir by descent is as absolute
as that of the purchaser; both are alike liable to be divested,
by a sale for the debt of the former owner. So, also, the judg-
ment against the former owner is liable to be divested, by a sale
on a judgment against the subsequent owner, and it is no objec-
tion that the former owner is not named in the proceedings.

That the Orphans' Court has exclusive jurisdiction in the set-
tlement of decedents' estates, no one disputes; but that an Or-
phans' Court sale is the only way in which the land of a decedent
can be converted into money, and the liens upon it discharged
and paid, is denied. The 33d section of the Act of 24th Feb-
ruary 1834 recognises a sale on an execution, and directs that
the balance of proceeds, after paying *liens of record,* shall be
paid over to the administrator for distribution.

Here the lien-creditors of the ancestor have received the pro-
ceeds of the sheriff's sale of the land in question, sold in the
hands of the heir, and are not here to question the title of the

[Horner & Roberts *v.* Hasbrouck.]

purchaser under that sale. Their judgments being the first lien upon the property sold, they had the right to come upon the fund, whether it be large or small. It has been decreed to them, and that decree is now final.

The purchaser at the second sale, with actual notice of the first, has no equity here; he is not a creditor. The uniform current of decisions in this state, establishing the doctrine that a judicial sale divests the liens against all former owners, has become a rule of property too firmly established to be overturned. The few exceptions to this rule chiefly (created by statute) are well defined.

If all lands held by descent or devise, when sold at sheriff's sale on a judgment against the owner, pass subject to the debts of the decedent, there would be no safety for purchasers, and none would be found to buy. The interest of creditors and debtors alike requires that the land should bring its full value, and that the lien-creditors should be paid out of the proceeds.

Two judicial sales should not be required to convert the land into money, when one is sufficient. And if the creditors of a decedent stand by and see the land sold at sheriff's sale, in the hands of the heir, without objection, and the proceeds are applied first to their liens, they should not afterwards be allowed to dispute the title of the purchaser, after taking his money, and after he has obtained a deed. Their time to object is before the sale is confirmed by the acknowledgment of the sheriff's deed.

Much less should a purchaser at a second sale, with notice of the first, be allowed to complain, where the creditors do not. Purchasers at a fair, public, judicial sale, trust to the law as expounded by the courts, and those who purchase in turn from them, pay their money upon the faith of the adjudications and decrees of the courts.

The opinion of the court was delivered, January 6th 1862, by Woodward, J.—Anciently when a man died in England without making any disposition of his testable goods, the King, as *parens patriæ*, used to seize the goods to the intent that they should be preserved and disposed of for the burial of the deceased, the payment of his debts, and to advance his wife and children, if he had any, and if not, those of his blood. This royal prerogative, granted sometimes to lords of manors, was invested finally in the prelates of the church, for it was said none could be found more fit to have such care and charge of the goods of the deceased than the ordinary, who all his life had the cure and charge of his soul. By Statute of Westminster 2, 13 Edw. 1, c. 19, it was enacted that the ordinary should be bound to pay the debts of the intestate, as far as his goods extended, in the same manner that executors were bound in case the deceased

[Horner & Roberts v. Hasbrouck.]

left a will; and in Snelling's Case, 5 Rep. 82, it was resolved that if the ordinary took the goods into possession he was chargeable with the debts of the intestate at common law, and that the above statute was only in affirmance of the common law. The *residuum*, after payment of debts, remained still in the hands of the ordinary, to be applied to whatever purposes his conscience should approve. Whether it should go to support the children of the decedent, or be applied to the pious uses of the church, or swell the revenues of the ordinary himself, depended on his will and pleasure. The flagrant abuses of this power led to the statute 31 Edw. 3, c. 11, which required the ordinaries to depute the next and most lawful friends of the dead person intestate, to administer his goods. This is the origin of administrators as they stand in England to this day. They are the deputies of the ordinary, and accountable to him in the spiritual courts for the execution of their trust: Henloe's Case, 9 Co. 38; Plowden's Com. 277; Marriet v. Marriet, 1 Strange 661; 1 Williams' Executors 350; 2 Bl. 495, 515.

It was not until the statute of 22 and 23 Car. 2. c. 10, that the surplusage of intestates' estates (except of *femes covert*, which were left as at common law) were required to be distributed among the next of kin, according to fixed rules. Thus it is seen that the right of creditors to be paid out of a decedent's goods was recognised, both at common law and by statute, long before the right of succession was secured to his children and kindred. But real estate was never treated in England as assets for payment of debts, and was not subject to administration either by the ordinary or his appointees.

In Pennsylvania, however, it was provided by the laws agreed upon the very year of the royal charter to Penn, that all lands and goods should be liable for debts—marking thus not only a wide departure from the example of our ancestors, but a fixed determination of the Founder of Pennsylvania that the right of succession to real as well as personal property should wait on the superior rights of creditors. A variety of laws were made prior to 1700 to regulate intestates' estates, and to fix the course of descent and distribution, a summary of which may be seen in the note to 3 Smith's Laws 153, but they all kept in view the paramount right of creditors, and made distribution among kindred of only the *residuum*, whether of real estate or personal goods, that should remain after creditors were paid. The 188th law, passed in May 1688 (3 Smith's Laws 54), provides "that any person who died intestate, being owner of lands, and who hath left or shall leave issue, it shall be lawful for the Court of Orphans, with the approbation of the governor and council, to empower the widow or administrator, in case of considerable debts, charge of child or children, to make sale of such part of

[Horner & Roberts *v.* Hasbrouck.]

said land as the council and court may judge meet." Thus one hundred and seventy-five years ago we find provision made for sale of decedent's lands to pay his debts if "*considerable*," which word meant, I suppose, that they should be more than his personal estate was able to pay. In that old statute was the root of our Orphans' Court planted. The idea was taken from the Court of Orphans of the city of London, which had the care and guardianship of children of deceased citizens of London in their minority, and could compel executors and guardians to file inventories, and give securities for their estates: Wimmer's Appeal, 1 Whart. 102; Hood on Executors 100. The Court of Orphans was one of the privileges of that free city; and that the people of Pennsylvania might enjoy the same protection, it was transplanted into our law, at first without any change of name, but afterwards called the Orphans' Court. The beginnings of this court were feeble. But it grew in importance with the increase of wealth and population, was recognised in our Constitution of 1776, and in each of our subsequent constitutions, and has been the subject of innumerable Acts of Assembly. What confusion and embarrassment had resulted out of the multitudinous and ill-digested legislation, touching this most important court, may be inferred from what Judge Duncan was forced to say in 1824 in McPherson *v.* Cunliffe, 11 S. & R. 432: "Nothing so much requires legislative attention as the proceedings of the Orphans' Court, for so sure as we descend into our graves so sure into this court we must come; and the man would be a public benefactor who would devise set forms and furnish directions in conducting the vast business in these courts, where every day finds so deplorable a system of confusion." The codifiers of our civil code were required by the legislature to take up this subject first, and they felt very sensibly the difficulties of their task. "The peculiar structure of the court," say they, "its extensive but ill-defined sphere of jurisdiction, the magnitude of the interests upon which it operates, the uncertainty of the code of law by which it is regulated, and its equally uncertain and insufficient practice and process, serve to surround with difficulties every attempt to frame a regular system for it."

They did, however, lay the foundations of a very regular system in a bill which they reported and the legislature passed, and which has ever since been known as our Orphans' Court Law of 1832. Two years subsequently the Act of 14th of April 1834 was passed, more fully defining and more completely systematizing the powers of the court. The first of these enactments continued to the Orphans' Court, under proper regulations, the power to decree a sale of decedent's lands for the payment of debts—the latter to make "distribution of the assets and sur-

plusage of the estates of decedents, after settlement of administration accounts, among creditors and others interested."

The power of the ordinary to appoint executors and administrators was transferred to a register, in pursuance of the laws agreed upon in England, and we have retained that officer with enlarged and regulated powers, but the accounts of his appointees are finally adjusted in the Orphans' Court, where jurisdiction over executors and administrators lasts from the moment of their appointment by the register until they are discharged after final and satisfactory settlement.

From this brief glance at the history of our Orphans' Court, it will be seen how we enforce the principle, never lost sight of in our jurisprudence, that the lands of a decedent, like his goods, are assets for payment of his debts, and that the right of succession has respect only to so much of his estate as remains after debts have been paid. When a man dies in Pennsylvania, his estate, real and personal, comes within the jurisdiction of the Orphans' Court, to be administered, first of all, for the benefit of creditors, and next for legatees, devisees, and heirs. If he die without creditors, and dispose of his estate by will, we do not realize the relation which the court bears to his estate, because its powers are rarely invoked; but if he die intestate and indebted, we see at once how the machinery of the Orphans' Court is adapted to the administration. We usually define an heir to be one on whom the law casts the estate at the death of the ancestor, but with us the estate is cast subject to the jurisdiction of the Orphans' Court. The personal estate is indeed the primary fund for payment of debts, but the real estate is as truly assets for this purpose as the personalty, though not to be first appropriated, and both realty and personalty are committed to the jurisdiction of the Orphans' Court. Heirs are thus postponed to creditors, and must wait a year for administration. If it be said, as for some purposes it is correct to say, that the estate vests in the heir directly the ancestor dies, it must be understood to be a contingent interest, defeasible in behalf of creditors. What really vests in the heir is a title to the *residuum*, or, in the language of our Act of 1834, the "surplusage" of the estate. This is what the law casts on the heir. It can be nothing else consistently with our system of administration and distribution.

When, on the 4th day of June 1856, John Walker, Sr., died intestate and indebted, his personal estate was committed by operation of law to his administrator, in trust, primarily for creditors, and his real estate descended to his eight heirs, subject to the jurisdiction of the Orphans' Court, to reclaim it for purposes of conversion into money to pay debts which the personalty should prove insufficient to pay. When, on the 1st of November 1856, Robert C. Walker, as administrator, presented his petition

[Horner & Roberts *v.* Hasbrouck.]

to the Orphans' Court, showing that the personal estate was insufficient to pay the decedent's debts, and praying for an order to make sale of his real estate, the jurisdiction of the Orphans' Court attached in form to the estate, and a sale was decreed and made. But the proceedings that were had, including the petition of the administrator, were set aside by the Orphans' Court, whose decree we affirmed : 1 Grant 431. Proceedings were not again renewed until after the sheriff's sale, hereafter mentioned, under which the defendant in error claims. But though the jurisdiction of the Orphans' Court which had attached was by its own judgment detached on account of irregularities in the proceedings, it was nowise impaired or diminished. It existed still as the only legal jurisdiction entitled to administer the estate of the decedent. The Courts of Common Pleas, and the District Courts of Philadelphia and Allegheny counties, have jurisdiction undoubtedly to convert a decedent's real estate into money for payment of debts, but they proceed in the course of the common law for the collection of debts, not in the forms of our statutes for the administration of the debtor's estate. And their proceedings may be restrained in favour of the jurisdiction of the Orphans' Court, whilst there is no statutory restraint upon the powers of the latter court in favour of those of the Common Pleas or of the District Courts. This is one of the striking changes introduced into our system of Orphans' Court proceedings by modern legislation. Whatever may have been the feebleness of the Orphans' Court originally, however its powers may have been involved in doubt and confusion from 1683 to 1832, there can be no doubt that under the statutes since the latter date it has become a court of record, with all the incidents of a court of record at common law—that it is clothed with authority to distribute estates of decedents among " the persons entitled to the same :" Kittera's Estate, 5 Harris 422—that the exclusiveness of its jurisdiction, and the conclusiveness of its decrees, have been placed by the Acts of Assembly and by the decisions of this court upon a foundation which cannot be shaken : Whitesides *v.* Whitesides, 8 Harris 474—that its jurisdiction within its appointed orbit is exclusive, and therefore necessarily as extensive as the demands of justice : Shallenberger's Appeal, 9 Harris 337—that it is possessed of chancery powers, and can proceed according to chancery practice to make all such decrees, interlocutory and final, as may be necessary in the administration of its appropriate duties : Black's Executor *v.* Black's Executor, 10 Casey 357. See also Thomas *v.* Simpson, 3 Barr 60 ; Seider *v.* Seider, 5 Wh. 208 ; Ashford *v.* Ewing, 1 Casey 215.

No diligent student of the various Acts of Assembly since 1832, and of the adjudications above named, can fail to see that the codifiers marked a distinct era in the history of the Orphans'

[Horner & Roberts *v.* Hasbrouck.]

Court, and lifted it to the dignity of a first-class tribunal; and that inheritance in Pennsylvania, where the decedent dies intestate and in debt, is limited to the "surplusage" of the estate after the debts are paid, and does really vest, for any practical and available purpose, in nothing more than that surplusage. If this were not so, a sheriff's sale on a judgment against an only heir, after descent cast, would take away the estate wholly from the creditors of the ancestor, and give it to the creditors of the heir. In other words, the principle that lands of a decedent are assets for payment of debts would be eradicated from the foundations of our jurisprudence, in which it was implanted by the hand of Penn himself. And it is no answer that the proceeds of a sheriff's sale would be distributable among the creditors of the ancestor; for first it is doubtful whether they would be entitled to proceeds as against judgment-creditors of the heir; but if they would, this is not the mode of conversion which the law has provided for them. A sale by the Orphans' Court has many advantages over a sheriff's sale on execution process, and creditors have a right to insist on the legal, which is the most beneficial form of conversion.

The judgment of James, Kent & Santee, entered against Samuel Walker on the 18th of October 1856, bound his possible interest in the surplus of his father's estate, and the sheriff's sale passed that interest to Arthurs, the purchaser, as fully as Samuel held it. Let it be observed at this point that these creditors could not be restrained from making this sale. Had they been creditors of the decedent, and having obtained judgment against him or his personal representative, had they proceeded to levy on the same land as *his* estate, the 35th section of the Act of 24th of February 1834, Purdon 200, would have applied to them, and they could have been restrained from making a sheriff's sale, in order that the Orphans' Court jurisdiction to make the sale might be maintained. But no such power of restraint extended to a sheriff's sale of the interest of the heir? Why? It may be answered, because the statute does not so provide. But I press the question: why did not the codifiers and the legislature make the statute broad enough to restrain such a sheriff's sale, as well as a sheriff's sale on process against the personal representative? The answer is obvious: they meant to protect only the estate of the decedent, and they understood very well that *that* could not be exposed to a sheriff's sale on process against the heir. The 35th, 36th, and 37th sections of this act were new and most important provisions. They were designed to commit the real estates of decedents to the Orphans' Court for conversion. The codifiers said: "We think that concurrent jurisdiction on subjects of this nature is not desirable. We will add," they said further, "that a sale of real estate by order of

[Horner & Roberts *v.* Hasbrouck.]

the Orphans' Court, is in almost all cases more advantageous for all parties than a sheriff's sale."

But it were a weak invention—this great and salutary reform in our law—if it could be defeated by hurrying up a sheriff's sale against the heir of the decedent. If the decedent's estate can be sold on process against the heir, then the system so carefully matured in the Act of 1834 is no system, and we are adrift again in a sea of uncertainty, as before the codifiers laid hand to the helm. But if we say that the sheriff sold to Arthurs only Samuel's contingent interest in his father's estate, then the Orphans' Court system is unimpaired, and Arthurs took what Samuel held, precisely as Samuel held it—subject to reclamation by the Orphans' Court.

Mr. Arthurs had full notice that this land of the decedent was needed for payment of debts, for it was upon his motion, as attorney of creditors, that the first Orphans' Court sale was set aside, and R. C. Walker turned out of the administration. His levy of the judgment he represented against Samuel, made the very day after he had got the administrator dismissed, did not oust the jurisdiction of the Orphans' Court; and the sheriff's sale in pursuance of that levy gave him no equities such as a purchaser without notice of the condition of the estate might imagine himself to possess, but left him with the mere legal title to Samuel's defeasible interest; and when he conveyed to Hasbrouck, on the 19th of May 1860, after the Orphans' Court was again in motion for a sale of the property as the estate of John Walker, Sr., the latter took no more than Arthurs held, and was a purchaser with legal notice of the condition of the title. Hasbrouck has no equities to allege, therefore, any more than Arthurs.

But, independently of all equities, it is insisted that the law has been settled in Pennsylvania to be as claimed by the plaintiff below; that the sheriff's sale of the heirship of Samuel divested the title of his ancestor. If the law be so, it is obvious that had Samuel been the only heir of his father, or had similar sheriff's sales been had against each of the eight heirs, the Orphans' Court would have been stripped of its jurisdiction, and the creditors of the decedent, instead of enjoying the fruits of a regular administration of their debtor's estate, would have been obliged to content themselves with such proceeds as the sheriff may have extorted from fragmentary sales of the several heirships.

Let us look into the authorities relied on: Milliken *v.* Kendig, decided in 1831, and reported in 2 Penna. Rep. 477, was as follows: Jacob Comfort, being indebted by judgment, died, and his real estate descended to his children, of whom Henry Comfort was one. Judgments were obtained against Henry, and execu-

tions issued, which were levied upon his interest in his father's estate, which was subsequently sold and the proceeds of sale brought into Court for appropriation. It was claimed by the creditors of the father and son between whom this issue was joined. The court below gave the money to the creditors of the son, a judgment which the Supreme Court reversed, and gave it to the creditors of the father.

An important diversity is that the Act of 1832 had not then been passed, and the decision was uninfluenced by that act and the subsequent ones which have enlarged and defined the jurisdiction of the Orphans' Court. Indeed, Judge Rogers, who delivered the opinion of this court, did not mention or refer to the Orphans' Court, and what proves conclusively that the question which we are considering was not before his mind, is his remark that he cannot distinguish the case from that of Commonwealth, for use of Gurney's Executors, v. Alexander, 14 S. & R. 257—a case that had no touch of descent or inheritance in it. In that case the familiar doctrine was affirmed that a purchaser at sheriff's sale under a judgment does not take the land subject to a prior judgment obtained against a former owner, unless it was sold expressly subject to such judgment. Chief Justice Tilghman illustrated his ruling by saying, if A. obtained judgment against B., who afterwards aliens to C., A. may levy on the land in possession of C. What the Chief Justice was contemplating was a case of alienation *inter vivos*, and not of succession to a decedent's estate. He put, *arguendo*, the case of Nichols v. Postlewaite, 2 Dallas 131, where A. devised lands to B., charged with legacies. The land was sold on judgment against B., and it was held that the proceeds of sale should be applied in the first place to the discharge of legacies, a doctrine which is both denied and reaffirmed by two cases in 16 S. & R. See Parr v. Bouzer, p. 309, and Barnet v. Washebaugh, p. 413. But neither Judge Tilghman, in ruling Alexander's Case, nor the judges who ruled the case he cited, referred themselves to the Orphans' Court law which prevailed at the time. And both cases were founded on purchase rather than inheritance, for devise is a form of purchase. The truth is, legislation had not yet marked out distinctly the jurisdiction of the Orphans' Court in converting the real estate of decedents, and hence the principles of decision found in such cases as the above are not applicable to a case that comes up under the modern legislation. It took some time to impress even the professional mind with the fact that the Orphans' Court Act of 1834 had committed all remedies for testamentary charges on land exclusively to the Orphans' Court. Strictler v. Shaeffer, 5 Barr 240. And the section bringing in widows and heirs to answer for debts of decedents was a provision that worked its way very slowly into

[Horner & Roberts *v.* Hasbrouck.]

notice. The current of prior decisions is what caused this reformatory legislation. It would be grossly illogical to permit the same current to destroy the legislation.

These observations are applicable to Luce *v.* Snively, 4 Watts 396. That was a contest like the present, between a sheriff's vendee of an heir and a purchaser at an Orphans' Court sale as the property of the decedent. But the Orphans' Court proceedings were under such legislation as prevailed before 1810. The court held that the sheriff's vendee took the estate discharged of the lien of the debts of the ancestor. This may have been good law in 1810, but it is not a rule which can be adapted to our legislation since 1832.

The recognition of Luce *v.* Snively, in Swaar's Appeal, 1 Barr 93, was only to distinguish it from the case then before the court, whilst Swaar's Appeal was ruled on the same ground as Mix *v.* Ackla, 7 Watts 316. In both of these cases the principle was distinctly asserted that it is only the interest of the heir, and not the estate of the ancestor, which passes by a sheriff's sale on a judgment against the heir, but in both cases there was a prior fixed lien in behalf of a widow. The authority of these cases is limited by that circumstance.

Granting that the authorities do insist on the general principle that judicial sales divest all liens where there is no fixed encumbrance like a widow's dower, it will be found that they all apply to sheriff's sales against alienees, or devisees, or heirs, before our modern legislation commenced in 1832. Since that time this court has never decided, so far as we remember, that a sheriff's sale of an heirship ousts the jurisdiction of the Orphans' Court in respect to the estate of the ancestor. Nor can such a decision be pronounced, for it would make havoc of the system of distribution, which the legislature, under the guidance of the codifiers, have provided. That system is compact, rational, and beneficent. It is best for creditors, as well as heirs.

It was wise to commit the decedent's estate to the Orphans' Court exclusively, for the machinery of that court is flexible, and can be adapted to the exigencies of each case, so as to prevent sacrifice and loss. It is a statutory mode of conversion, and therefore displaces, necessarily, all others. It is the prescribed form of applying to decedent's estates the always accepted principle that lands are assets for payment of debts. It must have its course. And in a conflict between a sheriff's vendee under a judgment against an heir, and a purchaser at an Orphans' Court sale, the title of the latter must prevail.

The judgment is reversed, and judgment is entered here for defendant in the case stated for costs.