Quality Lumber & Millwork Co., Appellant, *v.* Andrus.

412

Argued March 17, 1964.   Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*Robert S. Glass,* for appellant.

*Earl F. Glock,* for appellee.

OPINION BY MR. JUSTICE JONES, May 27, 1964:

This appeal presents an important issue: whether
the deed of the personal representative of a decedent,
who died intestate, conveyed title to the decedent's
realty to bona fide grantees *free and clear* of the lien
of a prior mortgage against such realty, the mortgage

having been executed by the decedent's sole heir[1] and recorded within one year subsequent to decedent's death and while letters of administration were still in effect.

Marie Sedlemeyer (decedent), died, intestate, on April 4, 1956, leaving as her sole heir, Marie Andrus, her daughter. Decedent owned certain improved realty in Johnstown wherein, with Mr. and Mrs. Andrus, she resided and wherein Andruses continued to reside after decedent's death. This realty, at the time of decedent's death, was lien free.

Several weeks after decedent's death, Mrs. Andrus qualified as personal representative of decedent's estate of which the realty was the sole asset. Approximately eight months later—December 15, 1956—Mrs. Andrus, *in the capacity of decedent's heir,* joined by her husband, executed a bond and mortgage—the latter in the amount of $5200[2]—in favor of Quality Lumber & Millwork Co. (Quality), a partnership. This mortgage, ostensibly secured by decedent's realty, was recorded on January 7, 1957. *At the time this mortgage was executed, Mrs. Andrus was still acting as personal representative of the estate, but she did not execute this mortgage in that capacity.*

On April 25, 1957, Mrs. Andrus secured from the Orphans' Court of Cambria County a discharge and release of the surety bond, posted by her at the time she secured letters of administration, averring that the realty remained unsold, that all estate debts, including inheritance tax, had been paid, that she was the sole heir and that she knew of no unfinished estate business.

---

[1] The personal representative and the heir are one and the same person.

[2] Quality averred that the proceeds of this mortgage were used to remodel and improve the realty, to pay off a personal indebtedness of Andruses and, in part, to repay money borrowed to pay decedent's funeral expenses.

On March 30, 1960, by deed recorded March 31, 1960, Mrs. Andrus, *in her capacity as personal representative of the estate,* sold decedent's realty for $6950 to Frank and Amelia Zupancic (Zupancics). Prior to such sale and pursuant to §541 of the Fiduciaries Act of 1949 (Act),[3] Mrs. Andrus requested and secured from the Orphans' Court of Cambria County an order excusing her from furnishing additional security in connection with the sale of the realty to the Zupancics.

Two years after the sale to Zupancics, Quality, the Andruses' mortgage being then in default, issued execution upon the bond which accompanied the mortgage. Zupancics then petitioned the Court of Common Pleas of Cambria County to stay and set aside the execution upon the ground that Quality's mortgage lien was invalid. Upon answer and certain stipulated facts, the court dismissed Zupancics' petition, holding that Quality's mortgage was a valid encumbrance. The Superior Court unanimously reversed (201 Pa. Superior Ct. 189, 191 A. 2d 685), and we granted allocatur.

Resolution of the question raised on this appeal involves a construction of several sections of the Fiduciaries Act of 1949.

Section 104 of the Act (20 P.S. §320.104) provides: "Legal title to all real estate of a decedent shall pass at his death to his heirs or devisees, *subject, however, to all the powers granted to the personal representative by this act and lawfully by the will and to all orders of the court."* (Emphasis supplied). Section 104— embracive by its provisions of *all* realty of a decedent, i.e., regardless of whether the heir or devisee was or was not in possession—was drafted upon the theory that ". . . the legal and equitable title to real estate passes to heirs or devisees [as such title had passed under the law prior to the Act]" with the proviso, how-

---

- [3] Act of April 18, 1949, P. L. 512, §541, 20 P.S. §320.541.

ever, that, *during the period of administration of the estate,* ". . . the personal representative will have the same powers over real estate as he has over personal property except as the Act makes express provisions to the contrary."[4] Thus, upon the death of the decedent, Mrs. Andrus acquired legal title to this realty in her capacity of sole *heir,* but such title was *expressly* subjected to those powers statutorily granted to her in her capacity of *personal representative.*[5]

Our next inquiry is to ascertain the powers of the personal representative to which an heir's legal title to realty is subjected under Section 104.[6] Section 541 of the Act (20 P.S. §320.541), as presently pertinent, provides: ". . . the personal representative *may sell,* at public or private sale, . . . any real property not specifically devised. When the personal representative has been required to give bond, no proceeds of real estate shall be paid to him until the court has made an order excusing him from entering additional security or requiring additional security, and, in the latter event, only after he has entered the additional security." (Emphasis supplied). It will be noted that such power of sale is not limited by any requirement that the sale purpose be for payment of debts or expenses. Section 541 explicitly empowered and authorized Mrs. Andrus, *as personal representative,* to sell the decedent's realty and, prior to the sale of such realty and in compliance with §541, she was excused by the orphans' court from furnishing additional security.

---

[4] Comment of Joint State Government Commission, 20 P.S. §320-501, p. 114.

[5] That Mrs. Andrus was both *heir* and *personal representative* does not alter the situation under Section 104.

[6] A personal representative may, in addition to the powers discussed, maintain actions as to the realty (§501, 20 P.S. §320.501); lease realty (§542, 20 P.S. §320.542); collect rents (*Webb Estate,* 391 Pa. 584, 138 A. 2d 435).

Section 547 of the Act (20 P.S. §320.547) prescribes the quantum and quality of the title which a personal representative conveys when such personal representative exercises the powers granted under §541, supra. Section 547, as presently pertinent, provides: "If the personal representative has given such bond, if any, as shall be required in accordance with this act, any sale ... by [the personal representative], whether pursuant to a decree or to the exercise ... of a power under this act, shall pass the *full title* of the decedent [in the realty], unless otherwise specified, *discharged from* the lien of legacies, from liability for all debts and obligations of the decedent, from all liabilities incident to the administration of the decedent's estate, and *from all claims of distributees and of persons claiming in their right,* except that only a sale under section 543 shall divest liens of record at the time of the decedent's death.[7] Persons dealing with the personal representative shall have no obligation to see to the proper application of the cash or other assets given in exchange for the property of the estate."[8] (Emphasis supplied). Thus, by its express terms, §547 provides that, when a personal representative sells realty, such sale passes the *full title* of decedent *free and clear,* inter alia, of "all claims of distributees and of persons claiming in their right."

Considering the application of §547 to the instant factual situation, Quality has a claim, evidenced by a bond and a mortgage, based upon a loan of money made by it to Mrs. Andrus, the sole heir of the decedent. Quality now seeks repayment of that loan by way of recourse to the realty of the decedent. The only theory upon which Quality can look to the realty of the decedent—decedent having been a stranger to the trans-

---

[7] Since there were no liens of record against the realty when the decedent died, §543 is not presently applicable.

[8] Cf. *Adamo Estate,* 82 Pa. D. & C. 222, 2 Fiduc. Rep. 618.

action—for repayment of its loan is that, at the time of the loan and the execution of the bond and mortgage, the legal title to the realty had passed to Mrs. Andrus as the sole heir of the decedent and, thus, Mrs. Andrus was in a position to pledge repayment of Quality's loan out of such realty. The crux of Quality's theory is that, as the sole heir of decedent, the realty had *then* passed or *been* "distributed", by operation of law, to Mrs. Andrus. The claim of Quality is derivative in that Quality must stand, if at all, in the position of claiming in the "right" of Mrs. Andrus, whether she be called an "heir" or "distributee", i.e., as the creditor of Mrs. Andrus. (Cf. *Coble v. Arnold,* 13 Fiduc. Rep. 281.) At first blush, it might appear that the use of the word "distributees" in §547 is confusing. However, when one considers that Mrs. Andrus, as every other "heir", must claim title to the realty on the theory that the death of the owner automatically marks the passage of legal title to the "heir", the use of the word "distributees", in the sense of one to whom distribution *has been made,* becomes evident. Unless Quality believed that Mrs. Andrus had, as heir, *become* vested with the title to this realty, it would have no basis for asserting any claim against the realty. That Quality's claim stands in the position of the claim of a "person" claiming in the "right" of a "distributee" within §547 is clear beyond question; that being so, the sale by the personal representative of decedent's realty passed full title to the vendees *free and clear* of such claim.

That Quality's claim is evidenced by a bond and mortgage—the latter being recorded and a judgment entered on the former—does not alter the situation. Quality's claim is still within the divestiture provisions of the statute. Even though the mortgage be construed as a conveyance of an interest in the realty (*Tryon v. Munson,* 77 Pa. 250), the divestiture provisions of §547 apply to both liens and estates of realty if the "claims

of distributees or of persons claiming in their right" are based on such liens or estates.

Section 547 operates to divest Quality's claim and Zupancics received from Mrs. Andrus, as personal representative, a full title to the realty free and clear of Quality's mortgage.

Section 615 of the Act (20 P.S. §320.615) does not aid Quality because the Quality-Andrus mortgage transaction took place within the year after decedent's death and at a time when not only had letters of administration been issued but were still in effect. The court of common pleas and Quality place great stress on the undisputed fact that, at the time she executed the mortgage, Mrs. Andrus was an heir in occupancy and possession of the realty and they urge that §501 (20 P.S. §320.501) applies to the instant situation. Section 501 provides: "A personal representative shall have the right to and shall take possession of, maintain and administer all the real . . . estate of the decedent, *except real estate occupied by an heir or devisee*. . . . The court may direct the personal representative to take possession of, administer and maintain real estate occupied by an heir or devisee if this is necessary to protect the rights of claimants or other parties. *Nothing in this section shall affect the personal representative's power to sell real estate occupied by an heir or devisee.*" (Emphasis supplied). It is urged that §501 severely restricts the power of a personal representative in selling realty where the realty is occupied or possessed by an "heir" of the decedent and that the personal representative's authority to deal with such realty arises *only* when the "rights of claimants or other parties" require protection and, since in the case at bar, there were no "claimants" or "other parties" to be protected, Mrs. Andrus, as personal representative, lacked power and authority to deal with the instant realty. Such contention is without merit: first, §501 deals *solely* with the

power of a personal representative to possess or enter into possession of the realty; second, §501 *expressly* states that nothing therein "shall affect the personal representative's power to sell real estate occupied by an heir or devisee"; third, the logical consequence of such a contention would lead to a determination of the validity of a sale effected by, or a lien created by, an "heir" on the basis of whether there was a *need* for administration of the estate or whether the administration of the estate had been completed as a practical matter, an ad hoc method of determination which would be chaotic in its results.

We have given full consideration to the other contentions of Quality, such as the impact on the instant situation of the Act of April 30, 1929, P. L. 874, §1 (21 P.S. §651) and of Article I, §1, of our State Constitution, and we conclude that such contentions have no merit.

The situation depicted on this record arose from the grossly improper conduct of Mrs. Andrus who is not a party of record. The parties of record—Quality and Zupancics—, insofar as the record reveals, acted in good faith in the several transactions. What recourse Quality may have against Mrs. Andrus or what the orphans' court may or can do as to Mrs. Andrus are not matters before us. We deal here solely with the impact of the Fiduciaries Act of 1949 upon the Andrus-Quality transaction and the Andrus-Zupancic transaction. That statute—drafted for legislative approval by persons long experienced in the administration of decedents' estates—was intended to create stability of procedure for the disposition of decedents' realty and personalty and certainty in the marketability of title. Its aim was not simply the protection of the heirs and devisees of a decedent but also the protection of those who dealt with such heirs or devisees and decedents' personal representatives. The terms of the statute must be strictly

complied with if the legislative purpose is not to be thwarted and the conclusion we reach is mandated by the provisions of the statute.

We agree with that which the Superior Court stated (p. 195) : "It would therefore seem evident that Quality was negligent in granting credit to the heir in her individual capacity while letters of administration were in existence. . . . It should be noted that [Zupancics] could not properly have taken a deed from Mrs. Andrus in her individual capacity and have acquired full ownership to the property. Until a distribution had been made, the only proper source of the full title of the decedent was the administratrix. Any one checking the title was justified in searching against [decedent] alone, since record notice of any transfer out of her name would be shown only by some act of the personal representative or by an adjudication or decree properly indexed. . . . Before accepting title from the administratrix, [Zupancics], took the normal precautions which the [Act] required. It was not necessary for [Zupancics] to check the judgment and grantor indices with regard to intervening action by the heirs. While there was only one heir in the instant case (who was also the administratrix), an exception would require that searches be made against all heirs regardless of number. This would largely nullify the advantages gained by the [Act] in the marketability of a decedent's real estate."

In conclusion, we re-echo a warning, recently given,[9] that those who purchase from or who grant credit to an heir or devisee, in the absence of the joinder in the transaction of the decedent's personal representative or a court decree awarding the interest of the decedent to such heir or devisee, assume the risk of later acts of

---

[9] Fiduciary Review (December, 1963), p. 3.

the personal representative or a subsequent decree of the court.[10]

Order affirmed. Each party to pay own costs.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:　.

I am unable to share the view of the majority that the Fiduciaries Act of 1949 mandates that a mortgage of intestate realty, executed by a sole heir in possession, accepted in good faith and duly recorded, is completely divested by a conveyance executed by a personal representative more than three years later.

I disagree also with the majority's pronouncement that, under the instant circumstances, a purchaser four years after the death of the record owner was required only to search the title of decedent and that it was unnecessary to make such examination against the sole heir who had been in continuous possession of the premises.

For generations, prior to and since the early common law, the legal title to a decedent's realty passed to heirs. It was only by statute very many years later that land became devisable by will. The clear and historical distinction between the administration of a decedent's real and personal property has long been recognized and firmly established in this Commonwealth and remained without material change until the Fiduciaries Act of 1949. Prior to that Act, real property was not an asset under supervision of the personal representative, unless such control was granted either by will or by order of court.

The Fiduciaries Act of 1949 preserved and reaffirmed the basic and traditional differences in the passage of decedent's real and personal property. That Act, by providing that "legal title to all real estate of a decedent shall pass at his death to his heirs or devisees, subject, however, to all the powers granted to

---

[10] Cf. *Horner & Roberts v. Hasbrouck*, 41 Pa. 169.

the personal representative by this act . . ." (§104), did effect certain stated changes in the administration of decedent's realty. The "subject to" clause and the special rules for real property found in such sections of the Act as 501, 541, 545, 547, and 615, although directing that under specific statutory circumstances the real estate is brought under the control of the personal representative, reveal also the limitations upon such administration and reaffirm the traditional differences in the administration of decedent's realty.

Section 501 withholds from the personal representative the right to "take possession of, administer and maintain real estate occupied by an heir or a devisee" unless directed to do so by the court. Similarly, §541 explicitly denies to the personal representative the right to sell real property specifically devised.

Thus, it seems clear that the statutorily designated changes in the administration of real estate did not go as far as some advocated or as the result reached by the majority seems to indicate. It is obvious, too, that all distinctions between the administration of real and personal property were not eliminated and that the assimilation of realty and personalty under the Act have not been mandated.

If it be deemed expedient or desirable to attach to the deed of a personal representative the kind and degree of marketability and finality which the majority advances, that result should be accomplished and announced by the legislature, not by court decision.[1]

The majority places great reliance on the last sentence of §501, "Nothing in this section shall affect the personal representative's power to sell real estate occupied by an heir or a devisee." The majority, however, fails to read that sentence in the context of the preceding language of the section, particularly the fol-

---

[1] For example, statutory amendment to §547 is suggested in the Fiduciary Review, p. 2 (December, 1963).

lowing: "A personal representative shall have the right to and shall take possession of, maintain and administer all the real and personal estate of the decedent, *except real estate occupied by an heir or devisee.* . . . The court may direct the personal representative to take possession of, administer and maintain real estate occupied by an heir or a devisee if this is *necessary to protect the rights of claimants or other parties.*" (Emphasis supplied.) The majority does not recognize the objectives of that and other related statutory provisions which impose restrictions upon the personal representative's administration of realty.

The comment to §501 is revealing and helpful. The drafter's advise that the section "is based on the premise that the personal representative *except as stated* [e.g., where the heir is in possession] should have the duty as well as the right to control real estate until it is sold or distributed by decree or *until control is relinquished to the heir or devisee because it is not needed for administration.* The theory of the drafters has been that the legal and equitable title to real estate passes to heirs or devisees as heretofore, but that real estate should be administered as personal property, *with a few minor exceptions* when the nature of real estate requires a different treatment. During administration the personal representative will have the same powers over real estate as he has over personal property *except as the Act makes express provisions to the contrary.*

"It is not contemplated that rents shall be collected by the personal representative *from real estate occupied by an heir or devisee unless needed for payment of claims.*" (Emphasis supplied.)

The comment is explicit and persuasive that despite the enlarged duties of the personal representative, the Act does not operate to disturb unnecessarily the possession of heirs or devisees as it existed at decedent's

death unless required for administration of the estate. The personal representative is authorized to deal with real property only if it serves an estate or administration purpose or is directed by order of court.

The majority fears that such a limitation on the power to sell realty "would lead to a determination of the validity of a sale effected by, or a lien created by, an 'heir' on the basis of whether there was a *need* for administration of the estate or whether the administration of the estate had been completed as a practical matter, an ad hoc method of determination which would be chaotic in its results."

The concerns of the majority, in this respect, appear baseless for a number of readily apparent reasons. First, title examinations of real estate have always been, are now, and very likely will continue to be ad hoc determinations. Second, even under the majority's view of the nature of title which passes by deed of a personal representative (to realty in possession of an heir or devisee and not required to satisfy claims), long established practice and the realities of such transfers require the purchaser to exercise many precautions. Among others, he must verify the authority of the personal representative, and ascertain whether the title of decedent is good, whether the property is subject to a lien or charge, whether it was specifically devised, whether debts and death taxes have been paid, whether the will prohibits sale, whether the personal representative has given bond, whether additional bond is required. For the title search to include the heir would entail little additional effort.

Finally, the majority overlooks the persuasive fact that approximately three out of four estates, including the instant one, are relatively small and do not warrant or require the expenditure for a formal and complete administration. In this simple estate, four years after decedent's death, administration was not yet formally

completed nor was there practical necessity for taking steps toward that end. Because obtaining letters is generally an ex parte proceeding, as is discharge of the surety on the administrator's bond, the legal termination of the estate is largely within the power of the fiduciary. Thus, under the view of the majority, the personal representative has the authority to make conveyances four, five, ten or even more years after death until the letters are revoked or the personal representative is discharged. In effect, decedent's realty is made less readily marketable than prior to 1949.

The factually undisputed record, created by stipulation, establishes that as of April 20, 1957, all debts, including inheritance taxes, had been paid, that the sole heir-administratrix was aware of no unfinished business, and that the surety on her bond was discharged and released. Substantially the same facts were repeated of record almost three years later in the petition of the personal representative requesting that she be excused from filing additional security in connection with the proposed sale of the realty.

As already noted, the purchaser accepted the deed of the personal representative executed four years after decedent's death to premises continuously occupied by the sole heir. It is significant that the sale which the personal representative consummated was not "under order of the orphans' court" under §543 and did not "have the effect of a judicial sale."

Certainly, there was sufficient notice under the described circumstances to alert the purchaser that more was required to protect his purchase than her deed unless he preferred to rely, as he apparently chose to do, on the grantor's warranty contained in the deed. Had the purchaser searched the indices against the sole heir as ordinary prudence and this record suggest, that simple examination would have readily disclosed that she, as administratrix, was seeking to deal with the

property in a manner other than for the benefit of the estate. It cannot be maintained that the purchaser diligently took the proper steps to protect his title to the land in question.

The majority attributes to the mortgagee negligence in advancing funds on the mortgage. If negligence be a properly applicable standard, it is submitted that the purchaser who made payment three years after the mortgage and under the circumstances here described is certainly not free of fault.

At decedent's death, legal and equitable title vested in the heir. Her interest was capable of being transferred and passed to the mortgagee. The mortgagee's lien, however, was subject to certain specified risks, e.g., the necessity of a sale to pay decedent's debts or death taxes or the probate of a will devising the property. None of these hazards which might have adversely affected or divested the lien interest in the property came about. The lien was valid when it was created, and, as each of the possible hazards passed, the mortgage lien became more firmly established and less subject to divestment.

It seems, therefore, most unfair and unnecessary to conclude, as does the majority, that the lien of a validly created mortgage is divested not by a risk or hazard to which the mortgage was subject at the time it was created or by the need of the estate, but by an entirely unrelated circumstance—a transaction between the personal representative and a subsequent purchaser. The majority divests a properly acquired mortgage lien simply because a later purchaser failed to adequately protect himself from conduct of the personal representative having nothing whatever to do with the administration of decedent's estate. Had the purchaser searched the title of the heir, this controversy would have been avoided. His cause of action is against his grantor,

and his claim should not be satisfied in full out of the lienholder's interest.[2]

To me, the statutory language is clear and directs that the powers granted the personal representative to deal with real estate in possession of the heir are limited and are to be exercised only when required for the proper administration of decedent's estate.

I dissent.

Mr. Chief Justice Bell and Mr. Justice Musmanno join in this dissenting opinion.

---

[2] Since the majority brands the conduct of the personal representative as "grossly improper" and yet reaches a result which is entirely adverse to the lienholder, ought not this Court, within the means at its command, afford some relief to the injured parties? Should not this matter be certified to the orphans' court, the tribunal which has exclusive control over the fiduciary, for an appraisal of her conduct and for possible surcharge, restitution or other appropriate action? Should not a personal representative who uses fiduciary authority to deceive the court which clothed her with that authority and to injure the innocent—as in this case—be required to answer in that court? In this way, the rights of the mortgagee, as well as of the purchaser, would be safeguarded, even though the majority here reverses the court below and decides this case against the lienholder.