[PHILADELPHIA, FEBRUARY 18th, 1837.]

## CHAMBERS *against* CARSON.

1. A *scire facias* upon a mortgage of lands in *Dauphin* county, was sued out of the Court of Common Pleas of that county in 1793, and removed into the Supreme Court in 1794, where judgment was entered for the plaintiff in 1797. *Held*, that a *scire facias, quare executionem non*, was properly issued out of the Supreme Court in 1834.

2. It is not necessary by our practice to obtain the leave of the Court before issuing a *scire facias quare executionem non*, upon a judgment more than thirty years old.

3. A *scire facias* upon a mortgage is not within the 34th section of the act of the 24th of February, 1834, requiring the widow and heirs or devisees of a decedent to be made parties to a suit against his executors, &c.

4. The 39th section of the act of the 13th of June, 1836, was intended to provide a method of serving the writ of *scire facias*, when service can be made, and not to alter the practice of returning *nihil* when service cannot be made.

THIS case came before the Court again (see *ante.* p. 9,) on a rule obtained on the 14th of February, by Mr. *M'Clure* on behalf of the defendant, to show cause why the judgments upon the *scire facias* and a *levari facias* since issued to *Dauphin* county, should not be set aside.

On the hearing, the circumstances appeared to be as follows.

On the 10th day of July, 1789, John Carson, the defendant's intestate, gave a mortgage upon certain lands in Dauphin county, to one Frederick Pigou of London, to secure the payment of £3781 5s. 4d. sterling. Upon this mortgage a *scire facias* was sued out in the Court of Common Pleas of Dauphin County, to September term, 1793, and this suit was removed by the defendant, into the Supreme Court in Philadelphia, to April Term, 1794, where judgment was entered for the plaintiff by agreement of parties for £2156 7s. 4d., on the 30th day of December 1797. On the same day this judgment and mortgage were assigned to Thomas Duncan, (the plaintiff's testator,) who was the brother-in-law of the defendant, John Carson, for a full consideration; and the judgment was afterwards marked to his use upon the docket of this Court.

Nothing further appears on the records of this court, until May, 1834, when the present plaintiff issued a *scire facias post mortem*, and *post annum et diem*, upon this judgment, directed to the sheriff of Philadelphia county, returnable to the term of July, 1834, when the sheriff made his return "*nihil habet.*" An *alias scire facias* was then issued to December term, 1834, upon which a similar return was made; and on the 15th day of December, 1834, judgment was entered on motion of C. *Chauncey*, Esq. for the plaintiff.

On the      th day of February, 1836, a *scire facias post annum et diem* was issued upon this judgment, directed to the sheriff of Philadelphia county, returnable to March term, 1836, which was returned by the sheriff "*nihil habet*," and an *alias* was issued to July, 1836, upon which the sheriff made a similar return, and on the first day of this term, judgment was entered for the plaintiff on motion, in open court. On this judgment a *levari facias* was issued on the third day of February, 1837, to the sheriff of Dauphin county, with a clause stating that it had been suggested by the affidavit of the plaintiff, according to the provisions of the 76th sec. of the act of 16th June, 1836, that there was no property on which the execution could be levied in Philadelphia. Under this execution, the mortgaged premises in Dauphin county, were levied upon by the sheriff, and advertised for sale on the 14th of March following.

The rule was obtained on the following affidavit of the defendant, viz.

" Before me, a justice of the peace, in and for the county aforesaid, personally came Charles Carson, administrator of John Carson, deceased, who being duly sworn, doth depose and say, that his father died a number of years since in Dauphin county, and that administration of his estate was granted by the register to this deponent, and to his brother John P. Carson, who is likewise now dead seven or eight years since. Deponent further says, that he has resided constantly in the county of Dauphin, and borough of Harrisburgh for the last six years, and that no writ of *scire facias*, or citation, or notice of any kind has been served on him, or given to him by the sheriff of Philadelphia county, or any other person, of any proceeding being had in the Supreme Court of Pennsylvania, on the above judgment, which this deponent believes was settled and paid off many years before the death of his father. Deponent further says, that he knows among other things, of Thomas Duncan's getting 100 acres of land of his father, part of the old farm, which would at one time have sold for $100 an acre ; and he believes he got deponent's mother's share in her father's Stephen Duncan's estate, of which Thomas Duncan was one of the executors. Deponent further says, that the first notice he had of this matter was a few days since, when the sheriff mentioned the fact of his having a writ of execution to this deponent ; and further saith not."

Mr. *M'Clure* now contended that the judgment should be set aside, as entered improvidently, and contrary to law, for several reasons. First, The *scire facias post mortem*, &c. on the original judgment of 1797, was in the name of Thomas Chambers, administrator, &c. without any notice of F. Pigou, the original plaintiff. Second, That this proceeding had been had after the lien of the judgment had expired. By the act of 1799, establishing the Circuit Courts, it is

declared that no judgment shall be a lien upon lands, except in the county where it is given; and by the act of 1705, proceedings by *scire facias* on a mortgage, must be in the county where the land lies. But here the proceeding was had in a distant county, and that too more than thirty-five years after the judgment was rendered, when it must, on the face of the record, be presumed to have been satisfied. *Cope* v. *Humphreys*, (14 *Serg. & Rawle*, 15.) And by the rules of this court, (5 *Rawle*, 364,) no judgment can be entered on a warrant of attorney more than 20 years old, without notice given to the defendant, if he be within the state of Pennsylvania; and by the acts of 1798 and 1836, judgments do not continue liens on real estate, longer than five years, unless renewed. Again, these judgments were erroneous, because the *scire facias* was not in accordance with the 34th sec. of the act of 21st Feb. 1834, which requires that the widow and heirs, or devisees of a decedent, shall be made parties to any action by which it is intended to charge the real estate of the decedent. And finally, that the *scire facias* in this case was not served in the manner prescribed by the 39th sec. of the act of 13th of June, 1836, directing the service of writs of *scire facias* to be in the same manner as in cases of *summons*. As to the execution, if the court had jurisdiction of the case, they might perhaps frame a writ of execution, but they had no jurisdiction, and therefore could not issue execution to Dauphin county; and there was no precedent for a *testatum levari facias*. On these grounds he contended, the judgments and executions should be set aside, and the plaintiff remitted to his remedy by suit on his bond, or ejectment on his mortgage, if the claim were not really and in fact satisfied.

Mr. *Bayard* and *Mr. Sergeant*, (with whom was Mr. *Chauncey*,) for the plaintiff—first showed the facts of the case, which were not on the record, viz:

That on the 3rd of February, 1808, John Carson, the defendant's intestate, by a written instrument of that date, recognised the assignment of the judgment and mortgage to Thomas Duncan, on the 30th December, 1797, on which Thomas Duncan was to give him credit as of the 14th March, 1798, for one hundred acres of land, at £1500, ($4000,) and for a horse at £35, ($93 33)—and he, John Carson, agreed that the judgment should be considered as revived, and the mortgage renewed to Thomas Duncan. That in November, 1820, Charles Carson, the present defendant, (his father then being dead,) recognised the existence of the mortgage in a letter to his uncle, Thomas Duncan, requesting his assistance in procuring a loan from one of the city banks, upon this property; and on the 4th of January, 1821, executed an instrument acknowledging that Thomas Duncan had agreed that his mortgage should be postponed to the mortgage then to be given to one of the banks for such loan. That in 1824, an adjustment of the claim of Judge Duncan, upon John

Carson's estate, under this mortgage, was made by James Duncan, acting on behalf of his brother Thomas, and John M. Foster, Esq. on behalf of Charles Carson, the defendant; when it was agreed by these gentlemen, that after giving credit for 100 acres of land at $4000, and a horse at $93 33, the sum of $5143 04, was due to Thomas Duncan on the 14th of May, 1824. And finally, that a writ of *scire facias* was sued out upon this mortgage, in the Circuit Court of Dauphin County, to December term, 1828, by the executors of Thomas Duncan, (he being then dead,) against the present defendant, and his late brother, administrators of John Carson, to which they pleaded (among other things,) "*a former recovery,*" by the judgment entered in this court in December, 1797; whereupon that suit was discontinued in the year 1833, and the *scire facias* in this county, issued in 1834, in the name of the present plaintiff, who had been substituted for the executors of Thomas Duncan, who had been regularly discharged. They also exhibited a deed, executed by John Carson, on the 6th of March, 1802, conveying all his wife's interest in her father's estate, to James Duncan, for the sum of $2000, acknowledged to be received by him. From these facts, the plaintiff's counsel said it was evident that the defendant had no merits—as he did not pretend that he had paid any thing himself, but swore that he believed the whole had been paid in his father's lifetime; which was contradicted, not only by the father's acknowledgment in 1808, but by his own repeated recognitions since his father's death; and the suggestions as to the 100 acres of land, and his mother's share of her father's estate, were both fully answered by the facts before the court. In applications of this kind, there are two questions. 1st. Does the party come forward *in time?* 2d. Does he show *good cause* for setting aside the judgment? In neither of these respects, has the defendant entitled himself to the interference of the court. There was a judgment regularly entered in 1797, on which the defendant never asked to have satisfaction entered. Two years also have elapsed since the judgment in 1834; during which the defendant might have asked the action of the court; and it is not competent for him to say he did not know of it, for it was his duty to know it; knowing as he did, that there was a judgment here on which a *scire facias* might be issued, and especially after his plea of "*a former recovery,*" to the suit in Dauphin county. But even if he had been in time, the defendant has not shown *good cause* for setting aside these judgments. As to merits, he has none clearly, from the facts of the case; and there is no irregularity in the proceedings. The *scire facias* was properly issued in the name of the present plaintiff, under the provisions of the act of twenty-third of April, 1829, reciting the original judgment in favour of Pigou, and the assignment to Thomas Duncan. Then, as to the act of 1834, referred to;—in the first place, it cannot control this case, for it did not go into effect until the 1st of October, 1834, whereas the first

writ of *scire facias* was issued in May, and returned to July, 1834 ; and the *alias* necessarily conformed to it. But if any part of the act could apply, it would be the 23d sec. which requires a *scire facias* to issue to the personal representatives, as was done in this case, and not the 34th sec. which applies only to cases of actions originally brought against executors, &c. whereby the land of a decedent is to be charged ; and not to the case of a *scire facias* on a judgment obtained against the decedent, in his lifetime, or upon a mortgage given by him. Neither does the 39th section of the act of the 13th June, 1836, apply to this case. That directs the mode in which a *scire facias* is to be served when the defendant can be found within the county, but does not affect the practice of entering judgments upon two returns of " *nihil*," which is in fact a dispensation with service, from the necessity of the case ; for the record being within the county, the plaintiff cannot follow the defendant to any other place, and therefore, he, having been once within the jurisdiction of the court, must continue so until the judgment is satisfied. As to the alleged presumption, that the judgment of 1797, was satisfied ; in the first place, there is no such presumption, in opposition to the evidence before the court ; and in the next place, that judgment never was a *lien*, but an order of this court, authorising a sale of the land, under the mortgage ; which was, and still continues to be a lien upon the land, recorded in the county where the land lies, and remaining unsatisfied to this day. The writ of execution, though called a *testatum levari facias*, was in fact, an original *levari facias ;* and the clause suggesting that there is no property of defendant in this county, was introduced from caution, but does not affect the character of the writ. The court had a right to issue it, in order to carry into effect the judgment obtained in 1797, which by the act of 1799 remained in this court, and must be executed by its own process.

The opinion of the court was delivered by

KENNEDY, J.—Upon a rule to show cause why the writs of *scire facias*, together with all the proceedings thereon, including the judgments of revival, should not be set aside, it is objected,—

First. That the writs of *scire facias* to revive the original judgment in the *scire facias* on the mortgage, ought to have been sued out of the Court of Common Pleas of Dauphin County, inasmuch as the mortgaged land lies in that county, and the original *scire facias* upon the mortgage was sued out from that court. That this course ought to have been adopted and pursued, because the act of 1705, authorising the proceeding by *scire facias* upon a mortgage, requires the writ to be sued out of the Court of Common Pleas, in which the mortgaged land lies ; and again, because the act of 1799, establishing the Circuit Courts, and abolishing the Courts of Nisi Prius, in

the several counties of the state, except the county of Philadelphia, seems to provide for and authorise it.

The original writ of *scire facias* upon the mortgage here, was sued out of the Court of Common Pleas of Dauphin County, in strict conformity to the act of 1705 ; but this act has no reference to, and contains no direction for suing out writs of *scire facias*, for the purpose of reviving judgments obtained in the writs of *scire facias* thereby authorised to be sued out upon the mortgages themselves. As to the court from which the *scire facias* to revive the judgment should be sued out, in case it became necessary, this was left to be regulated and directed by the principles of the common law, which require that it shall be from the court where the judgment shall be obtained, and still remains. At the time when the *scire facias* was sued here upon the mortgage, it was competent for either party, before the trial in the Common Pleas, to remove such cause for that purpose, into the Supreme Court. This continued to be the case until the act of 1799, above alluded to, was passed. Anterior to this, the Supreme Court was held only in the city of Philadelphia, but had jurisdiction over the whole state. Courts of Nisi Prius, however, were held by the judges thereof, in the several counties throughout the state, for the purpose of trying all issues of fact joined in causes removed therefrom, and receiving the verdicts of juries thereon. The prothonotary of the Supreme Court attended in person or by deputy, the courts of Nisi Prius, with all the papers on file in his office, appertaining to the cause, which might be wanting on the trial of it by the jury ; and took charge of the verdict when given in at Nisi Prius, which was produced by him to the Supreme Court, when sitting in bank, where it was acted upon by the court, in either setting it aside and granting a new trial, in arresting the judgment, or entering the judgment of the court upon it. If the verdict and judgment happened to be in favour of the plaintiff, he was entitled, if he chose, to have execution upon the judgment, which was sued out of the Supreme Court holden at Philadelphia, directed generally in the first instance to the sheriff of the county, whence the cause had been removed : and, in such case as the present, could not, at any time, be directed to the sheriff of any other, as it could only be against the mortgaged land, which could not be sold under the *levari facias*, by the sheriff of any other county than that in which the land lay. So, when the plaintiff sued out a *ca. sa.* with a view to proceed afterwards against the special bail, I take it that it was requisite, that the *ca. sa.* should be directed to the sheriff of the county, from which the cause had been removed into the Supreme Court, as it was fairly presumable the defendant resided there, and would not be found elsewhere. If the plaintiff however, neglected taking out execution for the space of a year and a day, after obtaining his judgment, he could not regu-

(Chambers *v.* Carson.)

larly do so then, without reviving it first, by *scire facias quare executionem non.* This being a judicial writ, could only be sued out of the court where the judgment remained upon which it was to be grounded. But it is argued, that by the act of 1799, the judgment in the *scire facias* upon the mortgage, ought to have been transferred to the Circuit Court of Dauphin County, as soon as this latter court came into being, and upon the annihilation of it, then to the Court of Common Pleas thereof, from which the writs of *scire facias quare executionem non*, ought to have been sued out. This act, however, only provided for the transfer of *actions pending* and *undetermined* in the Supreme Court at the close of the December term thereof, in 1799, to the Circuit Courts of the counties respectively, from the courts of which they had been removed, thence into the Supreme Court. And the 12th section of that act, provides expressly, "that in all actions or suits in the said Supreme Court, where *judgments shall have been rendered*, or *decrees passed before* or *during the said December term next*, and in all cases there depending before the said Supreme Court, for their decision on law points, the records, docquets, declarations, and other papers respecting the same, *shall be*, and *remain in the custody of the Prothonotary of the Supreme Court*, and be proceeded on in the said Supreme Court, by *execution* or *otherwise*, as to justice shall appertain." Now the original judgment in the present case having been obtained at December term, 1797, in the Supreme Court, two years before, was of course according to the provision of the section just recited, to remain in the Supreme Court for execution, to be had of it by the plaintiff, in the usual form theretofore practiced. Accordingly it became necessary to sue out the writs of *scire facias*, for the purpose of having execution of it; and not as has been suggested by the defendant's counsel, in his argument, to renew or to continue the lien of it. The judgment here, never created any lien upon the lands or real estate of the defendant, so that there was no lien to be renewed or continued, by reviving it. The only lien existing here upon land belonging to the intestate of the defendant, was created by virtue of the mortgage, and not by force of the judgment obtained in the *scire facias*, sued out upon it. The acts of assembly, therefore, referred to and relied on by the counsel for the defendant, directing the course of proceeding by writs of *scire facias*, for the purpose of continuing the liens of judgments upon the real estates of the defendants therein, have no application to this case. The acts of assembly limiting the liens of judgments to five years, unless continued by writs of *scire facias*, sued out and served in the manner therein prescribed, do not extend to, or embrace the lien here, which cannot be considered as arising from a judgment in any way.

This being a proceeding upon the mortgage according to the act of 1705, it is also, therefore, considered as not coming within

the provisions of the 25th, 33rd, and 34th sections of the act of the 24th of February, 1834, which have been referred to by the counsel of the defendant, in order to show that the course adopted and pursued here, falls greatly short of what is required by these sections.

It has also been alleged, that the writs of *scire facias quare executionem non*, ought not to have been sued out after so great a lapse of time, without a previous allowance or order of the court. But we have no rule of practice, restraining a party from suing out a *scire facias quare executionem non*, after any length of time, without such order. (See *Leslie* v. *Nones*, 7 *Serg. & Rawle*, 419.) It is very possible it might be expedient to have a rule on the subject. In the King's Bench and Common Pleas of England, they have rules, making it necessary in certain cases, to obtain a rule first, for suing out the writ. And in either court, if the judgment be above twenty years old, there must be a rule first obtained to show cause, and served on the defendant. 2 *Tidd*, 1156-7, (8th ed.)

It has been urged likewise, that according to the 39th section of the act of 13th of June, 1836, (*Pamph. L.* 579,) the last writ of *scire facias*, at least, being sued out subsequently thereto, ought to have been served on the defendant, as therein directed ; and that without this, no judgment of revival ought or could have been regularly entered. This section declares, that " in every case in which a writ of *scire facias* may be issued, it shall be served and returned in the same manner as is therein provided, in case of a summons in a personal action, and judgment for default of appearance, may be taken at the same time, and in the same manner, as in case of a summons as aforesaid, unless it be otherwise especially provided." This merely prescribes the manner generally, in which a writ of *scire facias* shall be served ; making it a sufficient service, without the presence of two or more witnesses, to read the writ in the hearing of the defendant, or by giving him notice of its contents, and a true and attested copy thereof ; or if he cannot conveniently be found, by leaving such copy at his dwelling-house, in the presence of one or more of the adult members of his family ; or if he reside in the family of another, with one of the adult members of the family in which he resides. But there is no alteration of the law here, as it stood before, in respect to the effect of the return of two *nihils* to the first and second, or *alias* writs of *scire facias*, which have ever been deemed equivalent to a return of *scire feci*. *Burnet* v. *Cleyton*, (*Dyer*, 168, a.) *Ratcliffe's case*, (*Id.* 172, a.) *Bromley* v. *Littleton*, (*Yelv.* 113.) *Barrock* v. *Thompson*, (*Styles*, 281, 288, 323.) *Clarke* v. *Bradshaw*, (1 *East*, 86.) And in *Ratcliffe's case*, two *nihils* returned upon two writs of *scire facias* issued to have a charter of pardon of outlawry allowed, were held sufficient, notwithstanding the words of the statute, 5 Ed. 3, c. 12, be that no charter shall be granted, until

(Chambers *v.* Carson.)

it appear to the Chancellor by certificate, that the person outlawed, has rendered himself to prison in the court out of which the *exigent* issued; and he shall not be allowed until the plaintiff be *warned,* and the *warning certified,* to make the plaintiff plead upon the original, if he choose, &c. Thus making the return of two *nihils* equivalent to a service, even where the statute positively required that the party should be actually *warned.* So in *Bromley* v. *Littleton,* where the defendant in error, died pending the writ of error, her executors were held to be made parties to it, by the return of two *nihils* to the writs of *scire facias,* because it amounted to a garnishment. And in like manner with us, two *nihils* have ever been held sufficient to authorise an award of execution by the court, either upon a mortgage, or upon a judgment *post annum et diem.* *Warder* v. *Tainter,* (4 *Watts,* 270.) *Colley* v. *Latimer,* (5 *Serg & Rawle,* 211.)

We feel perfectly satisfied that the application to set the writs of *scire facias* and the proceedings thereon aside, or to open the judgments of revival, has no merits or good ground whatever to support it.

In regard to the grounds and merits of the defence set up here against the claim of the plaintiff, it may be proper to make some remarks. The original judgment in the *scire facias* on the mortgage itself, being obtained in December 1797, and nothing appearing from the record to have been done on it, till July 1834, a space of upwards of thirty-six years, when the first *scire facias quare executionem non* was issued, one might well presume it had been paid or settled in some way; and might feel at a loss, if it were not so, even to conjecture the reason of such great delay and forbearance to have any thing entered upon the record, tending to show that it was not satisfied. The presumption of payment, however, strong and violent as it may seem to have been from the great length of time, when the first writ of *scire facias* was sued out in 1834, has been most effectually and satisfactorily rebutted by documentary or written evidence of agreements between the parties in relation to the original judgment, that has not been denied, or attempted to be avoided by any thing that is even colourable.

In the first place it appears that on the very day that the original judgment was entered, the 30th of December, 1797, the late Judge Duncan, whose administrator is the real plaintiff here now, being the friend and brother-in-law of the then defendant, John Carson, who was intermarried with a sister of the Judge, paid the plaintiff, Frederick Pigou, Jr. the amount of the judgment, in consideration whereof the latter assigned it to Judge Duncan by writing under his hand. In 1808 the defendant, John Carson, by his writing under his hand, recognised Judge Duncan as the assignee of the judgment, and in consideration of his obtaining a credit thereon for £1500, the price of one hundred acres of land, and £35, the price of a horse, to be entered as of the year 1798, he obligated himself to convey

the hundred acres of land to Judge Duncan.    In 1820 John Carson, the original defendant, having died during the interim, Charles Carson, the present defendant, and then as well as now, the acting administrator of his father, the original defendant, made application by letter in writing to Judge Duncan, to aid him in borrowing a certain sum of money of some of the banks in the city of Philadelphia, to pay off other debts owing by and pressing upon his father's estate, by pledging the mortgaged land for the repayment of it; and wishing to know of Judge Duncan, at the same time, upon what terms he would release the land from the lien of his mortgage, so as to make it a good security to the bank that might loan the money wanted.    Accordingly a loan of money was procured from one of the banks of the city, through the interference of Judge Duncan, upon the defendant's giving a mortgage upon the land for the repayment of it, and upon Judge Duncan's agreeing that the payment of his mortgage should be postponed to that given to the bank.  And again, in May 1824, Mr. James Duncan, brother of Judge Duncan, on behalf of the latter, and Mr. Foster, a gentlemen of the bar of Harrisburgh, the residence of the defendant, on his behalf, jointly made out a statement in writing, signed by them, ascertaining and setting forth a balance of five thousand one hundred forty-three dollars and four cents to be due on the judgment at that time to Judge Duncan.    Thus all presumption of payment arising from mere lapse of time has been most completely repelled.    And as to the oath of the present defendant, stating his belief that the judgment was paid by his father in his lifetime, by the sale of the hundred acres of land, which, he thinks, would have sold for a hundred dollars per acre, without saying when, and by his mother's portion of the estate of her father, Stephen Duncan, deceased, which the defendant thinks Judge Duncan got; it is shown by the written agreement between the parties, that the one hundred acres of land were taken and to be credited on the judgment at forty dollars per acre as of 1798; and by a deed of conveyance duly executed in 1802, by John Carson, the original defendant, and his wife, it appears that all her interest in the estate of her deceased father was conveyed and transferred to her brother, James Duncan, in consideration of two thousand dollars received of him, so that the present defendant seems to be under a misapprehension in believing or supposing that Judge Duncan got it.    In short, it may be true, that the present defendant believed, as he states in his affidavit, that the judgment was paid or satisfied by his father in his lifetime, and yet it does not, in the slightest degree, after the production of the written evidence on the part of the plaintiff, tend to prove that the judgment has been paid or satisfied in any way whatever, further than the plaintiff's evidence shows it to be so.    Neither does the deposition of Mr. Fisher, in the least, disprove or contradict the written evidence of the plaintiff, as to the balance still due and claimed by him on the

(Chambers *v.* Carson.)

judgment. Mr. Fisher heard, at one time, a dispute between Judge Duncan and Mr. John Carson, the original defendant, about some land which the latter wanted the former to relinquish his claim to, or, as he said, if the judge did not, he would not convey the one hundred acres to the judge as he had bound himself to do ; which, as Mr. Fisher understood, was to be credited and to go towards paying the judgment : but whether the price of the one hundred acres was to be, in full or only part, satisfaction of the judgment, he does not know, nor did he hear them say; so that admitting all he says to be true, it is still perfectly consistent with the plaintiff's claim. The rule is therefore discharged.

Rule discharged.