## Tryon *et al. versus* Munson *et al.*

1. Indescriptive warrants on which the purchase-money had been paid. were mortgaged June 14th, describing them as "all those tracts of land surveyed or to be surveyed by virtue of the warrants," &c. The surveys were made June 30th. *Held*, the mortgage bound the land when surveyed : "*to be surveyed*" being a covenant that the land should be surveyed.

2. An indescriptive warrant gives no title to any particular land until survey, and therefore none can be seized on execution.

3. A warrant upon which the purchase-money has been paid is authority to survey vacant land to the person taking it out, and is a contract between the Commonwealth and the warrantee to permit him to elect to survey unappropriated land where he shall designate.

4. When the survey was made on the warrants mortgaged, the title enured to the use of the mortgagee in virtue of the warrantee's covenant to survey ; equity treating that as done which ought to be done.

5. A mortgage was for warrants not specified, but it stated that there were annexed lists containing receipts for the purchase-money, the names of the warrantees, &c. The mortgage was recorded, but the lists were omitted. *Held*, even if the mortgage were a defective instrument, it was not defectively recorded, and a scire facias on it was not on an unrecorded mortgage.

6. If an unrecorded mortgage, scire facias was the proper remedy ; the 6th section of Act of 1705, giving the remedy by scire facias, does not refer to a *recorded* mortgage ; it being on the mortgage and not on the registry.

7. Scire facias on a mortgage under the statute is original process provided for on the default of the mortgagor, and lies on all mortgages recorded or unrecorded.

8. Under the Act of 1705, a scire facias against the administrator of the mortgagor is regular; since the Act of February 24th 1834 it is not necessary to make the heirs or terre-tenants parties ; a proceeding under a scire facias against the administrator is binding on heirs.

9. Scire facias on a mortgage is a local action and must issue in the county where the land lies, and two returns of "nihil" are equal to a return of "scire feci."

10. A mortgage passes to the mortgagee the title and right of possession to hold till payment shall be made ; and he may enter, take actual possession, use the land and receive its profits, until the debt secured is paid ; he needs no legal remedy to enforce this right.

11. The title by deed good against the mortgagor is good against his heirs who are volunteers and take the place of the ancestor.

12. A sale on a judgment in a scire facias on a mortgage, although to be treated as unrecorded for want of sufficient description of the subject, was good against the heirs of the mortgagor, after thirty-three years from his death.

January 28th 1875. At Philadelphia. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, GORDON, PAXSON and WOODWARD, JJ.

Error to the Court of Common Pleas of *Columbia county :* No. 14, to September Term 1874.

This was an action of ejectment, brought March 2d 1867, in the Court of Common Pleas of Schuylkill county, by George K. Tryon and James J. Dull, against Samuel A. Munson, James W. Williams and Helen E. M. Williams, his wife, William Camble and Charlemagne Tower, for a tract of 436 acres 26 perches of land in Lower

[Tryon *v.* Munson,]

Mahantongo township. Munson and the Williams' claimed the ownership; Camble was their tenant and Tower their agent.

Under an Act of Assembly for that purpose, the cause was, on the 3d of February 1874, transferred for trial to Columbia county. It was there tried October 13th 1874, before Elwell, P. J.

The plaintiffs gave in evidence warrant November 18th 1793, to Philip Miller, for 400 acres in Pinegrove township, Berks county—afterwards Schuylkill county—survey June 30th 1794, for 436 acres, 36 perches and allowance, returned September 2d 1794; patent February 27th 1795 to James Wilson, for the same survey. James Wilson died in 1798 or 1799. Deed, March 5th 1858—Bird Wilson, one of the heirs of James Wilson, to Emily Hollingsworth, for his interest in the survey. Deed, December 23d 1863, Emily Hollingsworth, the only other heir of James Wilson, to George K. Tryon, for her interest in the same survey. His title afterwards became vested in the plaintiffs. They then rested.

The defendants having shown that Bird Wilson and John Adlum were the surviving administrators, &c., of James Wilson, offered in evidence a copy of a record of the Court of Common Pleas of Schuylkill county, duly certified November 12th 1831, by P. Frailey, prothonotary, as containing the entire record in the case, viz. :—

Præcipe March 23d 1829, William Parker, assignee of Charles Wollstonecraft and others *v.* Bird Wilson and John Adlum, surviving administrators, &c., of James Wilson, deceased, to issue scire facias sur mortgage. No. 140, to March Term 1829. The copy of mortgage accompanying the præcipe was dated June 14th 1794, from James Wilson to Charles Wollstonecraft and others, to secure separate debts to the several mortgagees in one year, and conveying " all those several tracts of land, surveyed or to be surveyed, which the said James Wilson and William Nichols, by certain articles of agreement, dated the 3d day of April 1794, * * * had a right to, in consequence of several entries in the Land Office, of which a particular list is annexed to the several articles of agreement, amounting in the whole to 152.720 acres, which the said William Nichols hath this day released to him (Wilson), and all the several tracts of land surveyed or to be surveyed by virtue of the warrants issued from the Land Office in consequence of the several payments mentioned in the receipts hereunto annexed, numbered from 1 to 14," &c. The præcipe was signed by C. Loeser, as attorney for plaintiffs. Then follow in the exemplification lists of receipts,signed by the receiver-general and dated respectively April 11th and 19th 1794, from a number of persons who are named, " by the hands of James Wilson, * * * for lands granted to them by warrants dated respectively as follows :" &c. The receipts are each of 10*l.* for 400 acres; one of the lists of receipts is for warrants dated November 18th 1873, in Pinegrove township, and con-

[Tryon *v*. Munson.]

tains "Philip Miller 10*l*. for 400 acres." The docket entry has the statement of the parties as in the præcipe ; also : "March Term 1829, debt 85.723*l*. 6*s*. 8*d*., 'Nihil.'"

The writ recited the mortgage in full, precisely as above given ; in connection with præcipe, it is signed "P. Frailey, Prothonotary." The sheriff's return was endorsed on the writ as follows : "'Nihil,' so answers Charles Frailey, sheriff."

Præcipe for alias scire facias, dated October 12th 1829, same as in the original; the copy of mortgage accompanying it also the same. Statement of parties in the docket entry the same.

The other docket entries are "'Nihil,' 28th October 1829. On motion of C. Loeser, judgment for plaintiffs."

The alias writ was in the same terms and with the recitals the same as in the original writ. The sheriff's return endorsed on the writ was "Nihil."

Præcipe for levari facias was dated October 5th 1830, stating the parties as in the former præcipes ; as did the docket entries.

The writ described the land directed to be sold as it was described in the copy of the mortgage and the writs of scire facias ; it recited also that the list of receipts were "hereto annexed," which expression did not appear in any of the previous writs. It was endorsed, "Debt 85.723*l*. 6*s*. 8*d*. Real debt 42.861*l*. 13*s*. 4*d*. Interest from 28th October 1829," "'tarde venit,' so answers Charles Frailey, sheriff."

Alias levari issued December 3d 1830, præcipe, docket entries and writ being in same terms and with same description of the land as in the former proceedings. Return of sheriff endorsed on writ was "tarde venit." Pluries levari issued to March Term 1831 : also to July Term 1831 ; præcipes, docket entries and writ the same as in former proceedings, and the sheriff's return on each "tarde venit." A third pluries levari issued to October Term 1831 ; præcipe, docket entries and writ the same as in former proceedings. The sheriff's return was : "Land sold to William Parker for the sum of $10.000."

The evidence thus offered to be followed by evidence of the sheriff's deed to Parker, recorded in sheriff's deed docket and the office of the recorder of deeds of Schuylkill county, and mesne conveyances vesting Parker's title in the defendants.

The offer was objected to by the plaintiffs, because there was no offer to show any mortgage ; neither the præcipes, nor the writs of scire facias and levari facias described any land mortgaged, and there was nothing in the copy of the record to show that the Common Pleas of Schuylkill county acquired jurisdiction over the land in controversy by the judgment or any execution issued on it; the proceeding being in rem and the record showing no land mortgaged the judgment and subsequent proceedings were void : the land surveyed under the Philip Miller warrant was not embraced in any

[Tryon v. Munson.]

mortgage referred to in the proceedings offered, and could not be; the warrant appearing by the evidence to be indescriptive, and there being no survey on it till sixteen days after the mortgage, and no return for two and a half months after the date of the mortgage, the warrant was a chose in action at the date of the mortgage, and could not be the subject of a mortgage, nor of any proceeding to debar the right of redemption by scire facias, and could not be sold by an execution; the papers purporting to be receipts of the receiver-general were without proof of their genuineness. No proceedings were had on the mortgage for more than twenty-three years after it became due and thirteen years after there had arisen a presumption of its payment, and no evidence was offered to rebut this presumption; no service was made on any of James Wilson's heirs; judgment on the scire facias created no new lien; a sale under such judgment passed title only by virtue of the lien of the mortgage as against his heirs and the title of the heirs was not affected by any sale under the mortgage.

The court admitted the offer and sealed a bill of exceptions.

The exemplification was given in evidence; also, deed dated October 25th 1831 from Charles Frailey, sheriff, to William Parker. It recited the levari mentioned in the record, commanding him to sell " the following 108 tracts of land, situated as follows: * * * 18 tracts of land of 400 acres each, situated formerly in Pinegrove township, Berks county, now Schuylkill county, surveyed on warrants dated November 18th 1793, and granted to the following-named persons," Philip Miller being one; the other tracts being described in their respective townships in the same way, and being those contained in the lists of the receipts of the receiver-general contained in the exemplification given in evidence; and conveying the tracts so named to Parker. The deed was acknowledged November 1st 1831, in open court, and recorded in the recorder's office of Schuylkill county.

The defendants then gave in evidence a number of mesne conveyances vesting the title to the Miller tract in them.

Also the deposition of Emily Hollingsworth, a granddaughter and only surviving heir of James Wilson, taken December 9th 1869. She testified that at the time, December 23d 1863, when she conveyed her interest in her grandfather's lands to Tryon, she had claimed no title or ownership to the lands; that neither she nor any of Wilson's heirs, so far as she knew, ever paid any taxes on these lands.

They gave in evidence a lease dated March 31st 1853, from Munson and Williams, defendants, to Jacob Kohler, for several adjoining tracts of land, including the Miller tract, for two years from the succeeding first day of April, the lessee to pay forty cents per ton for all the coal mined, and covenanting not to suffer coal to be mined by any other person, nor to cut any timber, nor per-

[Tryon v. Munson.]

mit any to be cut; to prepare for tillage one acre of ground with every house he should build; and to live in "the stone house" on the premises; in case of any trespass on the premises, to institute legal proceedings against the trespasser, and not underlet any part of the premises. They gave evidence that Kohler and Gamble were in possession under the other defendants. Kohler mined a large quantity of coal, and settled with the other defendants for it.

The plaintiffs offered in evidence an exemplification of the Wollstonecraft mortgage, recorded in Berks county, September 11th 1794, in connection with a certificate from the recorder of deeds of that county, that there was no other mortgage on record in that county between the same parties, and a certificate from the recorder of deeds of Schuylkill county, that there is no mortgage between the same parties on record in that county. Offered to show that there was no mortgage of the Miller tract ever recorded; and that the attempt to acquire title under the proceedings given in evidence by defendants was a fraud; and to show, in connection with a true certified copy of the record in the scire facias by Wollstonecraft against Wilson's administrators, and the production of the original record, that there were no lists of any land in the description of the mortgage in the præcipe, scire facias, &c., and none described in the judgment, and therefore no title to the Miller tract passed as against the heirs of Wilson to Parker.

The defendants objected to the copy of the mortgage as evidence to impeach the judgment in the scire facias.

The court rejected the copy of the mortgage, but permitted the plaintiffs to give in evidence what was offered as the true record in the proceedings on the mortgage against Wilson's administrators.

A bill of exceptions was sealed for the plaintiffs.

The plaintiffs then offered a copy of the mortgage with a certificate that there was no mortgage of the Miller tract recorded in Berks county; to show that no such mortgage was recorded in Berks county. Objected to by the defendants; admitted by the court for the purposes stated, and a bill of exceptions sealed for the defendants.

The plaintiffs offered an exemplification of the record of No. 140, to March Term 1829, certified December 5th 1844, to show the proceedings under which the sale took place. It was objected to by defendants as incompetent to contradict the exemplification of 1831. The court admitted the offer and sealed a bill of exceptions.

This exemplification was substantially as that of November 12th 1831, except that the lists do not appear as attached to the record until the levari, which recites the receipts as annexed to the mortgage and "also hereto annexed;" this expression did not appear in any of the preceding writs, &c.

Hiram Moyer, the prothonotary of Schuylkill county, testified that there were no marks on the præcipes for the writs of scire

[Tryon v. Munson.]

facias of any kind of a connection with it and any other papers, nor with the writs of scire facias; to the levari facias lists were annexed by a wafer; the pluries levari facias had lists attached to it; none to second levari; one inside third levari; three weeks previously he had searched and found the three pluries writs of levari facias in their proper places; he found the præcipe and scire facias in the execution numbers, not in their proper places; found the executions in the scire facias packages. He found a loose paper on file, similar to that in the third levari; it was not marked filed or attached.

There was evidence that the writs of scire facias, levari and lists attached were in the handwriting of Jacob Harner; so with the alias and pluries levari and the lists attached; that the loose list was in the handwriting of C. Loeser, Esq.; the exemplification of 1844 was in Harner's handwriting. Harner appeared to be prothonotary's clerk.

The defendants gave in evidence also receipts for taxes on the lands in controversy as paid by Munson and Williams, defendants, from 1852 to 1867, inclusive.

The foregoing statement, with the charge of Judge Elwell and the opinion of the Supreme Court, will sufficiently exhibit the case. Judge Elwell charged:—

* * * "The plaintiffs, by a warrant granted to Philip Miller on the 18th of November 1793, upon which a survey was made on the 30th of June 1794, for 436 acres and 26 perches, and for which a patent was granted to James Wilson on the 27th of February 1795, have shown a perfect title in James Wilson as of that date, and have shown that that title, by the death of James Wilson, became vested in Bird Wilson, a son, and in a daughter, now deceased, who was the mother of Emily Hollingsworth, leaving Bird Wilson and Emily Hollingsworth as the sole heirs of James Wilson, in the year 1832, thus vesting the title to the Philip Miller tract in Bird Wilson and Emily Hollingsworth at that time. The title or interest of Bird Wilson was conveyed to his niece, Emily Hollingsworth, in 1858. The whole of that title was conveyed by Emily Hollingsworth to George W. Tryon on the 23d of December 1863, and, by deeds from George W. Tryon, that title has been conveyed down to the plaintiffs in this suit; so that if there was no evidence for the defence, the title which the plaintiffs, Dull and Tryon, have shown to the land, would entitle them to a verdict against the defendants for the land in question. The matters that we have to consider then are as to the defence that is set up by the defendants.

"It is admitted on the part of the defendants that James Wilson was the owner of this Philip Miller tract, and they allege that on the 14th day of June 1794, he executed a mortgage to Charles Wollstonecraft and others for land, as they allege, by such a de-

[Tryon *v.* Munson.]

scription as embraced the Philip Miller tract.   That mortgage, it is alleged, was foreclosed, by a proceeding by scire facias in Schuylkill county, commenced March Term 1829, against the personal representatives of James Wilson, he having died in 1798 or thereabouts.   It is alleged that the mortgage being thus foreclosed by two scire faciases issued and returned 'nihil,' that there is nothing by which the party can be summoned; that this brought the parties in court; that a judgment was obtained ; that writs of levari facias were issued, and the property sold in 1831 to William Parker, to whom a deed was made and acknowledged by the sheriff of Schuylkill county.   To support these allegations the counsel for the defendants produced a record from the Court of Common Pleas of Schuylkill county, certified in the year 1831, a few days after the sheriff's sale, under which they claim, containing, as is certified by the then prothonotary of the court, all of the records pertaining to the case of Wollstonecraft's assignee against James Wilson's representatives, and containing, as we have held, when this evidence was offered, all that was necessary to constitute a description of the property sold, and embracing among the other lands the Philip Miller tract, in a list which we have held to form part of that record.   The sheriff's sale describes the Philip Miller tract as one that was sold by him. The execution in his hands commanded him to sell that tract. The deed was acknowledged in open court, and recorded, as far as sheriff's deeds are recorded, in the sheriff's deed-book, and the question that is now presented is whether that sale divested the title which was resting in the heirs of James Wilson at that time.

" [There has been evidence before the court in reference to those records at subsequent periods of time, but we feel it our duty to hold that the record certified at or about the time of this transaction, forty-five years ago, is better evidence and can be relied upon with more certainty than any present inspection of the records, or any that may have been had for a few years back, at subsequent and somewhat remote periods to the time when this transaction took place.]

" [We therefore instruct you, that the evidence of that sale, as presented here, is such as divested the title of the heirs of James Wilson, and vested it in William Parker, the purchaser at that sale; and we say to you that if there were any irregularities in that sale, if the judgment itself did not describe particularly the lands that were mortgaged or intended to be mortgaged, that yet, as the writ of execution issued by the court, commanding the sheriff to make sale of the property, among others, the Philip Miller tract, and as he did make sale in 1831, and from that time down to 1858, there being no evidence of any act whatever done by the heirs of James Wilson in reference to this land, and then only a conveyance of all the interest which one of the heirs had to the

other, and nothing further done until 1863, when a conveyance was made to Mr. Tryon by Emily Hollingsworth; in the meantime this land having been assessed for the taxes, beginning in 1841 and down to 1852, with the evidence of Miss Hollingsworth that they did not pay any taxes, and the additional evidence that from 1852 down to the commencement of this suit in 1867, the taxes were paid by those who now claim title under the William Parker purchase. Taking all these facts, in connection with the fact of the sale having been made in 1831, after this lapse of time and these facts considered, we say to you that the case made out by the defendants is one which shows a sale, such as under the circumstances conclusively vests the title to this Philip Miller tract in the defendants here, or some of them, as far as the title has been shown, to such an extent as entitles them to your verdict in the case.]

"[Our instructions, therefore, to you are, that, under all the evidence in the case, your verdict should be for the defendants.]"

The verdict was for the defendants.

The plaintiffs took a writ of error, and assigned for error the rulings of the court on the questions of evidence and the parts of the charge in brackets.

*J. W. Ryon* and *F. W. Hughes* (with whom were *A. C. Smith, O. P. Bechtel* and *Black*), for plaintiffs in error.

*J. E. Gowen* and *F. B. Gowen* (with whom were *R. F. Clark, G. DeB. Keim, S. P. Wolverton, C. R. Buckalew* and *Woodward*), for defendants in error.

Chief Justice AGNEW delivered the opinion of the court, May 10th 1875.

Without following the order of the assignments of error, this case may be discussed, so far as needful, under four heads, viz. :—

1. Was there a valid mortgage by James Wilson of the land surveyed on the warrant to Philip Miller?

2. Was the proceeding by scire facias against the administrator valid, and was it binding on the heirs of Judge Wilson?

3. Was the record in evidence sufficient to support the sheriff's sale?

4. Did the sale extinguish the title of these heirs?

The objection to the validity of the mortgage of Judge Wilson to Charles Wollstonecraft and others is, that it bore date on the 14th of June 1794, sixteen days before the survey on the warrant of Philip Miller, made on the 30th of June 1794. This warrant was indescriptive, and the particular land to be appropriated was unascertained until survey. It is contended, therefore, that there was at the time of making the mortgage no title in James Wilson

27 P. F. SMITH—17

[Tryon *v.* Munson.]

which he could mortgage. The argument is founded on the authority of Heath *v.* Knapp, 10 Watts 405, and other cases, deciding that there can be no valid sheriff's sale of an unexecuted warrant. This is true, because the sheriff must levy on the land when the real estate is intended to be sold under execution.. An indescriptive warrant gives no title to any particular land until survey, and therefore, none can be seized. But a warrant, upon which the purchase-money has been paid, is an authority from the Commonwealth to survey vacant land to the person taking it out. It is issued by virtue of law to the surveyor-general, who is bound to execute it. It usually runs in these or similar words : " These are, therefore, to authorize and require you to survey, or cause to be surveyed, unto the said Philip Miller, the quantity of acres by him applied for, &c., if not already surveyed or appropriated, and to make return thereof into the said Land Office, for which this shall be your warrant." It is, therefore, evidence of a contract between the state and the warrantee, to permit him to elect unappropriated land to be surveyed where he shall designate. Though as a contract or permission, paid for, to elect, it is not subject to an adverse levy, either as land or a chose in action ; it confers on the owner of the warrant a power to take land where he shall elect to have it. When the election is consummated by a survey, return and acceptance, the title is consummated, and has, according to several cases, the effect of a legal title, the patent being of course. What, then, was there to prevent Judge Wilson from mortgaging the warrant, as the representative of real estate, and covenanting to locate it, and thus render certain the land to be taken under it ? It is true no land passed instantly under the mortgage, but the right to take and define land did, with a covenant of the mortgagor to define it, for the use of the mortgagee. The right to have and locate land was not a mere inchoate thing, incapable of enforcement, but a valid legal right to have the warrant located and the land set apart. Hence, when the survey was made, the title enured at once to the use of the mortgagee, by virtue of Wilson's covenant to survey, equity treating that as done, which, in equity, ought to be done. By the terms of the mortgage Judge Wilson granted, bargained and sold, " all those several tracts of land surveyed, and *to be* surveyed, by virtue of the warrants issued from the Land Office, in consequence of the several payments mentioned in the receipts hereunto annexed, numbered from one to fourteen." He also assigned and transferred " the said receipts and the said warrants." *Habendum* " the said several tracts of land, with the appertenances," and "the said receipts and warrants." The words " to be surveyed " constituted a covenant to survey the lands not already surveyed: Penn *v.* Preston, 2 Rawle 14 ; Blank *v.* German, 5 W. & S. 36. Thus a covenant to define the land to be elected, and to pass under the mortgage, followed

the grant of the purchase-money and the warrant, which, on principles of estoppel, as well as equitable performance, would prevent Wilson or his heirs from holding the land adversely to the mortgage, after location under the warrant: Brown *v.* McCormick, 6 Watts 60; Tyson *v.* Passmore, 2 Barr 122; Root *v.* Crock, 7 Id. 378. This reasoning derives strength also from the doctrine of election, recognised in Coxe *v.* Blanden, 1 Watts 533, in which it was held that a treasurer's sale of a part of a tract of land, by quantity, and not by locality, is good, and confers an unrestricted choice of locality. For instance, a sale for taxes of 10 acres in a tract of 400 acres gives the purchaser a right to locate it on any part of the whole tract. A warrant to survey 400 acres of land, upon unappropriated land, in a certain county, is very analogous, with this difference in favor of the warrant, that it confers a contract or authorized election, whereas the treasurer is invested with no such express authority. The act of the treasurer is an adverse official act, and that was the strain of the case in Coxe *v.* Blanden. At common law, the absolute owner of land—and the state is such—may sell on terms of unrestricted election, but it was a question whether an officer could so sell. The principle of Coxe *v.* Blanden has been recognised in a number of cases: McCord *v.* Bergautz, 7 Watts 490; Krider *v.* Lafferty, 1 Whart. 303; Brotherton *v.* Livingston, 3 W. & S. 334; Beegle *v.* Wentz, 5 P. F. Smith 369. We are of opinion that the mortgage of James Wilson was valid to carry the title to the land surveyed under the Philip Miller warrant.

The next question is upon the legality of the proceeding by scire facias. In recording the mortgage, the lists were omitted containing the receipts of the receiver-general for the payment of the purchase-money—the names of the warrantees, number of acres, and purchase-money of each tract. It is contended that the mortgage was, for this reason, defectively recorded, and to be treated as an unrecorded mortgage, and that a scire facias lies not in an unrecorded mortgage. But it must be observed though, that while the instrument as recorded was itself defective, in that it contained no description of the land conveyed, it was not defectively recorded; on the contrary, it was fully proved and entitled at law to be recorded—could not be refused by the recorder, and was in fact recorded.

It cannot be said, therefore, that the scire facias issued upon an unrecorded mortgage. On the trial of the scire facias, another and a more serious question might arise, upon the effect or operation of the instrument as recorded, inasmuch as it did not describe or identify the warrants and receipts referred to in the granting clause. Yet it would be going too far to say that the defect in the description would prevent jurisdiction being taken by the court on the scire facias. But treating it as an unrecorded mortgage in

[Tryon *v.* Munson.]

effect, still we are of opinion that the scire facias was a proper remedy. The 6th section of the Act of 1705, which gives the remedy by scire facias, nowhere refers to the record of the mortgage. It provides, that where default is made by the mortgagor to pay or perform according to the tenor and effect of his mortgage, the mortgagee may, after a specified time, sue forth a writ of scire facias, directed to the proper officer, to notify the mortgagor to show cause why the mortgaged premises should not be taken in execution for payment of the mortgage money. This is a statutory remedy, given to every mortgagee, without exception, upon his mortgage and not upon the registry : Roberts *v.* Halstead, 9 Barr 34 ; Lancaster *v.* Smith, 17 P. F. Smith 427 ; Frear *v.* Drinker, 8 Barr 520. It furnishes an answer also to the learning of the books introduced into the able argument for the plaintiff in error, upon the writ of scire facias, as judicial process, founded upon some matter of record. The scire facias on mortgage, thus given by statute, is original process, provided as a remedy for the default of the mortgagor, and therefore lies on all mortgages recorded or unrecorded. The distinction between the scire facias as original, and this writ as judicial process, is shown in Chambers *v.* Carson, 2 Whart. 370, 371. The effect of an unrecorded mortgage, as against the heirs, will be considered hereafter, and for the present it will be sufficient to cite on the point before us, Hosie & Longstreet *v.* Gray, 21 P. F. Smith 198. The proceeding by scire facias was, therefore, proper. The second branch of this question is, whether the scire facias against the administrator of James Wilson bound his heirs, and this involves a primary inquiry, whether the proceeding was regular as against the administrator ? That it was so is clear. The Act of 1705 expressly authorizes the writ to be issued against the executors or administrators, and such has been the constant practice. This case occurred before the passage of the Act of the 24th of February 1834, and yet it has been held that a scire facias upon a mortgage, even since its passage, does not fall within the 34th section of that act, requiring notice to be given to the widow and heirs: Chambers *v.* Carson, 2 Whart. 370 ; Wallace *v.* Blair, 1 Grant 75 ; Hare *v.* Mallock, 1 Miles 268. Treating the heirs not as volunteers, but as purchasers and terre-tenants, still it has been repeatedly decided it is unnecessary to make the terre-tenants parties to the proceeding : Mather *v.* Clark, 1 Watts 491 ; Mevey's Appeal, 4 Barr 80. That the proceeding was binding on the heirs is also true. Prior to the Act of 24th of February 1834, debts of every kind were recoverable by action against the personal representative, without notice to the heirs, and a sheriff's sale of the real estate of a decedent, on such a judgment, conclusively passed the title, even as against an alienee of the heir : Morris *v.* Smith, 1 Yeates 238 ; Graff *v.* Smith, 1 Dallas 483 ; Evans *v.* Meylert, 7 Harris 411. The re-

[Tryon v. Munson.]

port of the commissioners to revise the civil code states the rule and the reasons for the change, as set forth in the 34th, 35th and 36th sections of the Act of 24th of February 1834 : 2 Park & Johnson's Dig. 759. An exception to this rule is found in Bailey v. Bowman, 6 W. & S. 118, where it was held that a judgment, execution and sale of land against the personal representatives for a debt, which has lost its lien, under the Act of 4th of April 1797, conferred no title. The question of lien, however, will be considered under the fourth head. The scire facias against the administrator, being binding on the heir, the last point under this head is as to the necessity of personal service. This point is also well settled. The scire facias is a local action, and must issue in the county where the land lies. Hence, two returns of nihil are equivalent to a return of scire facias : Warder v. Tainter, 4 Watts 270 ; Colley v. Latimer, 5 S. & R. 211 ; Chambers v. Carson, 2 Wharton 9 ; Hartman v. Ogborn, 4 P. F. Smith 120 ; McMillan v. Red, 4 W. & S. 237 ; Edmonson v. Nichols, 10 Harris 74 ; Allison v. Rankin, 7 S. & R. 269. The proceeding by scire facias was, therefore, regular and binding on the heirs.

The third head is, whether a sufficient record was produced in evidence ? This point, we think, is also with the defendants. The original record, and the two exemplifications of 1831 and 1844, were in evidence. In the original record, copies of the lists were found attached to the writs of levari facias, and a loose copy found among the papers on file. The copies attached to the writs of levari facias were in the handwriting of the prothonotary's clerk. The loose copy, therefore, belonged to no other place than the scire facias or the præcipe, which is equivalent by reason of the power to amend by it. The probability of this is heightened by the fact that this copy is in the handwriting of Mr. Loeser, the attorney, who gave the præcipe, and is further increased by the fact that in the exemplification of the record of 1831, made out by the same officer who issued the scire facias, the list of receipts and warrants is found attached to the scire facias. When we add to this the regularity of the sheriff's deed, and its acknowledgment, and the great time since elapsed, no doubt is left of the fact that the warrant of Philip Miller was a part of the land recited in the scire facias, and consequently the case is not one where a judgment was given without land described, upon which it could operate. The presumption of right doing, which attends judicial proceedings, and which is especially necessary in a matter so ancient as this, forbids a loss of title in a case where the evidence of regularity is so strong. There was quite enough evidence that the scire facias or the præcipe contained a description sufficient to support the sale of the lands described in the levari facias.

The last question, and the most important, is, whether the title of the heirs of Judge Wilson was extinguished by the sale ? This

[Tryon *v*. Munson.]

depends on the view which the law takes of the mortgage, as a mere debt or as an estate in the land. The position of the plaintiff is, that the descriptive lists of the tracts or subject of the mortgage being omitted in recording the mortgage, it is to be viewed as an unrecorded mortgage in its effect upon the estate of the heirs, and that as a debt its lien had expired under the operation of the Act of 1797. Nice's Appeal, 4 P. F. Smith 200, is referred to. If it be conceded that the mortgage is merely evidence of a debt, and conveys no estate in the land to the mortgagee, it must be admitted that the lien of the debt was gone when this proceeding took place, and that, according to the doctrine of Bailey *v*. Bowman, 6 W. & S. 118, and other cases, the title of the heirs was not extinguished. We are, therefore, cast upon the decisions in this state to ascertain the nature and effect of a mortgage. That the debt secured by it is personal in its nature and qualities of transmission is undoubted. Ownership of the debt carries with it that of the mortgagee; and its assignment or succession in the event of death, vests the right to the mortgage in the assignee or the personal representative of the deceased owner. But there is a manifest difference between the debt, which is a mere chose in action, and the land which secures its payment. Of the former there can be no possession, except that of the writing, which evidences the obligation to pay; but of the latter, the land or pledge, there may be. The debt is intangible, the land tangible. The mortgage passes to the mortgagee the title and right of possession to hold till payment shall be made. He may, therefore, enter at pleasure, and take actual possession—use the land and reap its profits. Now this title or lawful right to possess, and actual *pedis possessio*, are not ideal or contemplative merely, but are real and tangible. True, the right is conditional, and will cease on payment of the debt; but until the condition is performed, the title and possession are as substantial and real as though they were absolute. The evidence of this is that the mortgagee may dispossess and hold out the mortgagor until he performs the condition, or until the perception of the profits reaches the same result. Thus we perceive an interest or estate in the land itself, capable of enjoyment, and enabling the mortgagor to grasp and hold it actually, and not a mere lien or potentiality, to follow it by legal process and condemn it for payment. The land passes to the mortgagee by the act of the party himself, and needs no legal remedy to enforce the right. But a lien vests no estate, and is a mere incident of the debt, to be enforced by a remedy at law, which may be limited. It is true, if the mortgagee be held out, he may have to resort to ejectment, but this is to avoid a conflict, and the statutory penalties for forcible entry, for otherwise he may take peaceable possession, and is not liable as a trespasser. The difference between title by deed, and a lien by law, is clear, and hence the former is not governed by

the rules which apply to the latter. The title by deed, which is good against the mortgagor, is necessarily good against the heirs, who are mere volunteers, and take the place of the ancestor. But a lien by law is a mere incident to the debt, which may be limited by the law in its recovery from a descended estate. In the former case, death makes no change in the title conveyed; in the latter, it brings into operation a law specially applicable to the descended estate. That these are the principles governing the law of mortgage is evidenced by numerous decisions. Thus in Levine v. Will, 1 Dallas 430, it was held that the Act of 28th of May 1715, enacting that no mortgage or defeasible deed shall be good or sufficient to convey or pass a freehold of inheritance or less estate, unless it be acknowledged, proved and recorded within six months, does not avoid an unrecorded mortgage as against the mortgagor. C. J. McKean said: " We think it is sufficient against John Levine (the mortgagor) that the deed so far is sufficient to pass the lands, and that under it the possession of the premises might be recovered in ejectment." As to the right to maintain ejectment, and that the remedy by scire facias is not exclusive, see also Smith v. Shuler, 12 S. & R. 240; Fluck v. Replogle, 1 Harris 405; and Martin v. Jackson, 3 Casey 504. A mortgage acknowledged before and recorded by officers whose commissions had become void by the Declaration of Independence, was held to be good against a subsequent judgment-creditor and purchaser at sheriff's sale, who had notice: Parker v. Wood, 1 Dallas 436. So a scire facias on a mortgage not recorded according to law, was held to be good against a purchaser with notice: Stroud v. Lockart, 4 Dallas 153. In Semple v. Burd, 7 S. & R. 291, Judge Duncan gives the true reason why an unrecorded mortgage is good against the mortgagor, because, he said, " it injured no one, affected not the rights of any third person, and was binding on the man who executed it as a mortgage." That an estate passes by a mortgage which descends to the heir, is distinctly asserted in Simpson's Lessee v. Ammons, 1 Binn. 175. " As to the second point," says C. J. Tilghman, " the legal estate in the two-thirds, conveyed to Marshall (the mortgagee), descended on his death to his heirs; but the mortgage being in effect only a security for a debt due to the estate of Marshall, his heirs were trustees for the benefit of the administrators, who were entitled to the debt. It was determined in Kennedy v. Fury, 1 Dallas 72, that a certain *cestui que trust* may support an ejectment in his own name." This case also explains the theory of the action of the personal representative, which, as the chief justice states, is founded on the want of a court of chancery in this state. The Manufacturers' and Mechanics' Bank v. Bank of Pennsylvania, 7 W. & S. 335, affords another illustration of the character of a mortgage as an estate. There the mortgage was imperfectly recorded, and was not good as a lien

against subsequent judgment-creditors, but it was held good as against a second mortgagee, with notice of it, whose lien was prior to the judgments, and the money was therefore awarded to the first mortgagee. Another test is found in Scott *v.* Fields, 7 Watts 360, in which it was decided an action of debt will not lie on a mortgage containing no express covenant to pay the debt. In Philips *v.* The Bank of Lewistown, 6 Harris 394, Justice Lewis treats both the mortgage and the assignment of it, as formal conveyances of the land. Judge Strong states the principles governing mortgages more at large and very clearly: Britton's Appeal, 9 Wright 172. He says " that mortgages are sales, and that they must be, therefore, within this doctrine, is shown by many cases. Mortgagees are purchasers as between each other ; *i. e.*, a subsequent mortgage recorded is postponed to a prior mortgage unrecorded, of which the second mortgagee had notice. They are purchasers as against subsequent purchasers absolutely, with notice. They are purchasers under powers to sell. They are within the recording acts as to assignments of the same security to different parties. They are in form defeasible sales, and in substance grants of specific security, or interests in land for the purpose of security. Ejectment may be maintained by a mortgagee, or he may hold possession on the footing of ownership, with all its incidents. And though it is often decided to be a security or lien, yet so far as it is necessary to render it effective as a security, there is always a recognition of the fact that it is a transfer of the title." Mortgagees, he observes, have rights both as grantees and lien-holders ; and their rights as grantees are not forbidden by the Act of 1820, which touches the lien only, and not the estate. The same key unlocks the question before us. The lien of the debt, under the Act of 1797, was gone against the general estate of Judge Wilson ; but the special estate, granted by him in the mortgage, remained and preserved the debt against it. This effect might be seen in the case of a mortgagee in possession at the death of a mortgagor. Clearly, the lapse of time would not oust him, if his debt were unpaid. He could hold the land until the heirs tendered payment, or his debt was made out of the profits. The proceeding by scire facias against the administrators was valid, and the judgment being before the Act of 1834, bound the heirs. Probably the case would be different since the passage of that act, and the heirs would be permitted to make the same defence to the ejectment, which they might have set up to the scire facias, if they had been served : Wallace *v.* Blair, 1 Grant 75 ; Murphy's Appeal, 8 W. & S. 165 ; Benner *v.* Phillips, 9 W. & S. 13 ; Atherton *v.* Atherton, 2 Barr 112. Even an irregularity in the proceeding, as a judgment upon one return of nihil, has been held not to affect the purchaser at the sheriff's sale. The effect of the sale is to transfer the estate to the purchaser as fully as it existed in the mortgagor at the time of the

[Tryon *v.* Munson.]

mortgage : Hartman *v.* Ogborn, 4 P. F. Smith 120.   The sale in this case, therefore, extinguished the title of the heirs, notwithstanding the great lapse of time from the death of Judge Wilson until the proceeding upon the mortgages.   If the heirs had a defence they ought to have gone into court and asked the judgment to be opened to let them into a defence.   The judgment was final, and bars any defence which existed before it was rendered. Though the jurisdiction of the court may not be denied, as we have seen, because of an omission of part of the instrument in recording it, it may be conceded that the omission of a material part, necessary to identify the subject-matter, will reduce the whole instrument to the condition of an unrecorded mortgage in its effect upon the estate of the heirs.   In this view, Nice's Appeal, 4 P. F. Smith 200, is relied on by the plaintiffs in support of their position. But that case concedes the effect of an unrecorded mortgage upon the estate as against the mortgagor and his heirs, and only denies to it a higher place as against *creditors* than that of a speciality debt, in a distribution proceeding, after a conversion of the property through an Orphans' Court sale.   It is there shown that to allow it precedence over the general debts of a decedent, which are fixed in position by law at death, would disturb the harmony of the system relating to the estates of decedents and the payment of the debts.   In this case, the simple question is, whether the mortgage, considering it as unrecorded, could be enforced against the heirs of James Wilson ?   After a full consideration of the assignments of error, we find none which ought to reverse the judgment.

Judgment affirmed.